2024 UT App 1

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHARLES PHILIP GRANERE,
Appellant.

Opinion
No. 20190593-CA
Filed January 5, 2024

Third District Court, Salt Lake Department
The Honorable Linda M. Jones
No. 161909765

Ann M. Taliaferro and Kristin Wilson,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1     Charles Philip Granere appeals his convictions of rape of a child, object rape of a child, and aggravated sexual abuse of a child. He argues that his trial counsel (Counsel) was constitutionally ineffective in several respects, most notably for failing to request that the jury be properly instructed on unanimity; that the trial court erred in excluding evidence supporting his theory that the child victim, Beth,[1] had been sexually abused by another; and that insufficient evidence supported his convictions because Beth's testimony was inherently improbable. We agree that Counsel was ineffective for

---

1. A pseudonym.

failing to request a unanimity instruction concerning the charges for rape of a child and aggravated sexual abuse of a child, and we therefore reverse those convictions and remand for further proceedings. But because Granere's conviction of object rape of a child withstands all his challenges on appeal, we affirm that conviction.

BACKGROUND[2]

¶2      In September 2013, Granere, then a 34-year-old man, began dating a woman (Mother). Their relationship soon turned serious, and Mother introduced Granere to her three children, including her ten-year-old daughter, Beth.

¶3      Thereafter, because Granere "wanted to get to know" Beth and wanted Beth and his daughter, who was the same age as Beth, to "bond," Mother dropped Beth off at Granere's apartment in Salt Lake City for a sleepover on three or four occasions. But whenever Mother dropped Beth off for these sleepovers, Granere's daughter was not there and Granere told Mother that his daughter either had not yet arrived or had already left. Mother later testified that at the time Granere held these sleepovers, she never observed signs of trauma in Beth or behaviors such as excessive bathing or cleaning up after returning home from Granere's apartment. She also did not detect any odors indicative of sexual activity on Beth or notice any suspicious stains on Beth's clothing while doing laundry. Beth appeared to be upset to Mother only once after visiting Granere, the cause of which was attributed to a video game console, but Mother could not remember the specifics of that incident.

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶4     Mother also testified that Granere twice took her and Beth to his cabin in the mountains. Mother could not recall whether Beth ever accompanied Granere to his cabin alone, but she remembered that Granere once took Beth snowmobiling near his cabin.

¶5     Mother and Granere ended their relationship in late March or early April 2014. Nevertheless, Granere continued to have occasional contact with Mother and Beth. This contact came to an end in October 2015 following a cellphone-related disagreement.

¶6     Beth first disclosed to a friend that she had been sexually abused after the friend told Beth that she (the friend) had been sexually abused. Beth realized that what the friend described "kind of sounds like things someone did to me," and she then confided to the friend that she had also been sexually abused. In March 2016, Beth, now twelve years old, disclosed the sexual abuse to a school counselor, naming Granere as the abuser. The counselor reported the sexual abuse to a school administrator and to law enforcement. Mother was also called to the school, where Beth told her that Granere "had raped her." Mother took Beth home and also contacted law enforcement.

¶7     Beth was soon interviewed at the Children's Justice Center (the CJC). Among other instances of abuse, Beth told the interviewers that Granere once told her to get in the bathtub and to insert a "small and grey" object into her vagina. When Beth refused, Granere put his hand on hers and forced the object into her vagina, causing her to bleed. Beth stated that Granere then took her to his bed. Beth speculated, "he knocked me out or something again, because I can't remember anything from that," but she said that the following day, Granere told her, "Oh didn't you remember? We had sex." Beth also told the interviewers that on other occasions, Granere would pin her down by her arms and place his penis in her vagina, which she estimated happened "[l]ike five, seven times." Beth also recounted that on these and other occasions, Granere touched her breasts.

¶8    The following month, a sexual assault nurse examiner (Nurse) examined and interviewed Beth. Nurse observed that Beth had "two full transections that were healed [on] her hymen." Nurse later testified this type of injury is caused by "[p]enetrating trauma," possibly involving a penis, an object, or fingers; but—based on the exam—Nurse could not establish who caused those injuries.

¶9    The State charged Granere with rape of a child, object rape of a child, and aggravated sexual abuse of a child—all first-degree felonies.[3] In March 2017, Granere filed a pretrial motion under rule 412 of the Utah Rules of Evidence to admit evidence that Beth's uncle (Uncle), a convicted sex offender, had previously sexually abused her and that Uncle was the source of the two hymenal transections. Specifically, Granere argued that in mid-October 2013, Uncle was alone with Beth for half an hour on the night of her tenth birthday party, following which Beth went to the hospital experiencing pain, cramping, and vaginal spotting.[4] Following an evidentiary hearing, the trial court denied that motion under rules 412 and 403 of the Utah Rules of Evidence.

¶10    Regarding rule 412, the court stated that the evidence Granere presented at the hearing "fails to support that [Uncle] was the source of the injury, and there is no basis for allowing the evidence" at trial. And regarding rule 403, the court stated that even if Uncle had sexually abused Beth, the evidence Granere sought to present at trial was not "relevant to a material factual dispute" because the issue at trial was whether Granere—and not Uncle—had sexually abused Beth. The court further stated that

---

3. The State later amended its information to add a fourth count of sexual exploitation of a minor, but the jury acquitted Granere on that count.

4. We recount Granere's allegations against Uncle in greater detail in Part II below.

"such evidence, if it were presented to the jury, would be confusing and misleading." Granere later raised this same issue in a motion to continue trial and in a motion for a new trial, but both times the court reaffirmed its ruling to exclude any evidence supporting Granere's theory that Uncle had sexually abused Beth. The jury did, however, hear evidence that Beth went to the hospital on the night of her tenth birthday with complaints of pain, cramping, and spotting.

¶11 The case proceeded to a four-day jury trial in March 2019. As part of its case-in-chief, the State called, among others, Beth, Mother, and Nurse to testify. Mother's and Nurse's testimonies are, in relevant part, recounted above. Beth testified at trial that Granere sexually abused her at his apartment and at his cabin, and that the abuse occurred "many times." She stated that her first memory of abuse took place at Granere's apartment. He had challenged her to a drinking contest, and as she drank her bottle of blue Gatorade, she began feeling "weird" and "uneasy." She next remembered being in a bathtub with Granere sitting on the toilet beside her. Granere handed her a "little silver object" and instructed her to place it in her vagina. Beth did not want to, so Granere took her hand in his and directed it to the top of her vagina. Beth recalled him "rubbing his hand and my hand and putting it on like the top of my vagina," "inside the skin folds," and stating, "[H]ere, doesn't that feel better?" He then pushed the object further into her vagina. Beth felt a "stinging" and "burning" sensation and began to bleed. Beth testified that Granere next took her into his bedroom, sat her on his bed, and inserted his fingers into her vagina, causing her to bleed even further, and rubbed "the top part of [her] vagina." He also ran his hands up and down her waist, touching her breasts and buttocks. Beth stated that Granere also placed his tongue on her vagina, but it is unclear from her testimony when this happened.

¶12 Beth testified that another time in his apartment, Granere massaged her with baby oil and then offered her a drink that caused her to feel sleepy. She woke up to Granere on top of her

with his penis in her vagina, causing her to feel "a burning sensation." Beth stated that was the most vivid memory she had of Granere inserting his penis into her vagina, but she then proceeded to recount another instance when she had been asleep in the cabin and Granere woke her up and told her, "I stuck it in all the way." When asked, "How many times do you remember this happening . . . ?," Beth replied, "I know it's a lot more than seven." And when asked what they would do at the cabin, Beth replied, "He would rape me." Beth also described an instance at the cabin when she was lying on the ground and Granere's "head was in between [her] legs," shortly after which Granere masturbated in front of her.

¶13    As part of his cross-examination of Beth, Counsel played the 43-minute recording of Beth's entire CJC interview with the purpose of "count[ing] how many times she giggles, or laughs, or finds it funny." Counsel paused the interview over 50 times to ask Beth whether she had laughed or looked at the camera at that moment. Beth acknowledged repeatedly doing so throughout the interview. Beth also stated on cross-examination that she did not report the sexual abuse at the time because Granere repeatedly told her that "this is what fathers and daughters do" and she believed "that was a daughter and father relationship."

¶14    Granere called five witnesses to testify in his defense. He called his father and a detective to demonstrate that he could not have taken Beth to the cabin during the winter of 2013–2014. Granere's father testified that in early November 2013, he "winterize[d]" the cabin, which included shutting off the water, draining the water heater and the toilets, and shutting off the gas and the furnace. His father further stated that the cabin remained in that uninhabitable state until he opened it up by reversing the entire process during the first week of May 2014. And his father explained that if they wished to use the cabin during the winter, they would have to reverse all the actions he took to "winterize" the cabin, which "was an all day process to get it warm enough so that you could tolerate it."

¶15    The detective testified that from mid-November 2013 until mid-March 2014, Granere was serving a house arrest sentence in an unrelated matter, which required him to wear a GPS ankle monitor that tracked his location. He stated that the ankle monitor would have alerted authorities if Granere went to the cabin, and he had no record of any such violation. But the detective also stated that so long as it was during the time Granere was supposed to be at work, and so long as Granere was back home by curfew, it would have been possible for Granere to spend the day at the cabin without the ankle monitor alerting authorities.

¶16    Granere's wife, whom he married after he and Mother ended their relationship, testified that Granere was incapable of being "on top" because "he can't hold himself up on his knees." And contradicting portions of Beth's testimony suggesting otherwise, Granere's daughter testified that he had never sexually abused her (the daughter). Lastly, Granere testified on his own behalf. He denied sexually abusing Beth and denied that Beth ever spent the night at his apartment.

¶17    The jury found Granere guilty of rape of a child, object rape of a child, and aggravated sexual abuse of a child. Granere, still represented by Counsel, then moved to arrest judgment, arguing that the State's evidence was insufficient to support his convictions because Beth's testimony was inherently improbable. Following a hearing, the trial court denied the motion. Next, through new counsel, Granere moved for a new trial, arguing that he should have been allowed to present his rule 412 evidence that Uncle caused the two hymenal transections described by Nurse. He also asserted that Counsel was constitutionally ineffective for, in relevant part, playing the CJC interview for the jury and for not objecting to alleged prosecutorial misconduct during closing argument. The trial court denied this motion as well.

¶18    Granere appeals.

ISSUES AND STANDARDS OF REVIEW

¶19     Granere raises several issues on appeal. First, he argues that his convictions should be vacated because the jury instructions did not require unanimity on each count. Ordinarily, "a challenge to a jury instruction as incorrectly stating the law presents a question of law, which we review for correctness." *State v. Gollaher*, 2020 UT App 131, ¶ 20, 474 P.3d 1018 (quotation simplified), *cert. denied*, 481 P.3d 1040 (Utah 2021). But because we ultimately hold that this issue was not preserved, *see infra* Part I.A.1, we review this issue through the lens of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Elkface*, 2023 UT App 24, ¶ 7, 527 P.3d 820 (quotation simplified), *cert. denied*, 534 P.3d 752 (Utah 2023).

¶20     Granere also argues that Counsel was ineffective in other respects, two of which he raised before the trial court in a motion for new trial. In reviewing those two claims, "[t]here is no reason . . . to depart from the standard of review set out in *Strickland* simply because the appeal was preceded by a motion for new trial." *State v. Templin*, 805 P.2d 182, 185–86 (Utah 1990). Therefore, all of Granere's "ineffective assistance of counsel claims present a mixed question of fact and law." *Id.* at 186 (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). We thus "review a trial court's application of the law to the facts for correctness and, if applicable, we review the court's findings of fact for clear error." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 26, 493 P.3d 711, *cert. granted*, 502 P.3d 268 (Utah 2021).

¶21     Granere next contends that the trial court erred in excluding evidence that Uncle had sexually abused Beth and was the cause of Beth's two hymenal transections. We review a trial court's decision to admit or exclude evidence under rules 412 and 403 of the Utah Rules of Evidence for an abuse of discretion. *State*

*v. Beverly*, 2018 UT 60, ¶ 23, 435 P.3d 160. *See State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 ("We afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion.") (quotation simplified).

¶22     Finally, Granere argues that the court erroneously denied his motion to arrest judgment because "[t]here was not sufficient evidence to support the verdicts under the inherent improbability standard."[5] "We review a district court's grant or denial of a motion . . . to arrest judgment for correctness." *State v. Miller*, 2023 UT 3, ¶ 50, 527 P.3d 1087 (quotation simplified). We will "uphold a denial of the motion . . . to arrest judgment based on an insufficiency of the evidence claim, if some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified). In other words, we will "reverse the denial of a motion to arrest judgment only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Id.* (quotation simplified).

---

5. Because Granere raised this argument for the first time in his motion to arrest judgment, this claim is potentially unpreserved. *See State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052 ("[A]n objection that could have been raised at trial cannot be preserved in a post-trial motion."). But because the State does not assert that this issue is unpreserved and thus the parties have not briefed preservation, and because we ultimately resolve the merits of this argument in the State's favor, we do not further address preservation here. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415, *cert. denied*, 496 P.3d 718 (Utah 2021).

ANALYSIS

I. Ineffective Assistance of Counsel

¶23    To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure "to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified), *cert. denied*, 481 P.3d 1040 (Utah 2021).

¶24    Under the first element, defense counsel's actions amount to deficient performance if they fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. But "[j]udicial scrutiny of counsel's performance" is "highly deferential" in that the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under that presumption, "even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶25    To establish prejudice under the second element, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In conducting this inquiry, "an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly

the verdict is supported by the record." *Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396 (quotation simplified).

¶26 Granere argues that Counsel was ineffective for (1) failing to request a proper jury instruction on unanimity, (2) failing to seek exclusion of Beth's testimony as "unreliable and incompetent," (3) playing Beth's CJC interview at trial, and (4) failing to object to alleged prosecutorial misconduct during closing argument.[6] We address each argument in turn.

A.    Unanimity Instruction

¶27 Granere first seeks reversal of his convictions on the ground that "the jury was not required to render a unanimous verdict." Before we reach the merits of this argument, we must first determine whether this issue is preserved. And concluding

---

6. Granere also argues that Counsel was ineffective for failing to object to Beth's testimony regarding certain acts of abuse of which he was not given notice in the preliminary hearing. *See State v. Ortega*, 751 P.2d 1138, 1139 (Utah 1988) ("[A] criminal defendant cannot lawfully be tried for and convicted of a crime for which he or she was not given, or for which he or she did not waive, a preliminary hearing."). But because this challenge affects only his convictions for rape of a child and aggravated sexual abuse of a child, which we reverse on unanimity grounds, *see infra* Part I.A.2, we have no need to address this argument.

Granere also contends that Counsel was ineffective for not seeking exclusion of certain portions of Beth's testimony regarding uncharged acts under rules 402, 403, and 404(b) of the Utah Rules of Evidence. But because he offers no supporting analysis that the challenged evidence was inadmissible under those rules, he has not carried his burden of persuasion on this issue, and we therefore do not reach the merits of that argument. *See* Utah R. App. P. 24(a)(8).

that it was not preserved, we next proceed to review this issue for ineffective assistance of counsel.

1.     Preservation

¶28     An appellate court "generally will not consider an issue unless it has been preserved for appeal." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified).

¶29     Granere asserts that the *State* preserved this issue when it requested an instruction on the aggravated sexual abuse charge informing the jury that it is not required to "be unanimous as to which [unlawful touch] has been proved beyond a reasonable doubt, so long as each juror finds that at least one [unlawful touch] has been proven beyond a reasonable doubt."[7] The court

---

7. This is an erroneous statement of the law. As concerns sexual abuse of a child, "each unlawful touch of an enumerated body part (or each unlawful taking of indecent liberties) constitutes a separate offense of sexual abuse of a child under Utah Code section 76-5-404.1(2)." *State v. Alires*, 2019 UT App 206, ¶ 21, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020). In other words, "the sexual abuse of a child statute contains alternative *actus reus* elements by which a person could be found guilty of sexual abuse." *Id.* (quotation simplified). And *State v. Hummel*, 2017 UT 19, 393 P.3d 314, clearly provides that it "is well-established in our law" that "jury unanimity means unanimity as to a specific crime" and that "a jury must be unanimous on all elements of a criminal

(continued…)

rejected the proposed instruction on the ground that "the instructions already adequately address those issues."[8] The court added that the proposed instruction "hasn't been adopted by [the

charge for a conviction to stand." *Id.* ¶¶ 28–30 (quotation simplified).

The State likely confused this principle with the Court's holding in *Hummel* "that unanimity is *not* required as to *theories (or methods or modes)* of a crime." *Id.* ¶ 3 (emphasis added). *See id.* ¶ 65 (holding that alternative factual theories "of ways of fulfilling such elements . . . are not a necessary part of a verdict, and thus fall beyond the requirement of unanimity"). For example, where a statute provides that a defendant can commit theft through either deception or extortion, "[t]heft by deception and theft by extortion are not and cannot logically be separate offenses." *Id.* ¶ 21. Otherwise, a defendant "could be charged in separate counts and be convicted on both" where only "one act of theft" actually occurred. *Id. See id.* ¶ 61. Similarly, a "murderer who both poisons and suffocates the same victim has committed only one murder." *Id.* ¶ 21. *See id.* ¶ 62. Thus, the jury need not be unanimous on the defendant's mode or method of committing the crime—i.e., deception versus extortion, or poison versus suffocation—so long as the jurors unanimously agree that the defendant is guilty of the charged conduct. *See id.* ¶ 61 ("The statutory examples of means by which a person can meet the elements of the single crime . . . are not alternative actus reus elements . . . . They are simply exemplary means of satisfying the criminal elements defined by the legislature[.]") (quotation simplified). But this cannot be the case with different prohibited touches in the context of sexual abuse of a child because, as discussed above, separate touches constitute "distinct counts or separate instances of the crime . . . , which would have to be charged as such." *Id.* ¶ 28.

8. The court stated, "For example, the instructions tell them they have to find each element, and it gives them 'ors' in those elements, and the instruction tells them they have to be unanimous in the verdict."

Model Utah Jury Instructions] at this stage, and isn't a required instruction under" *State v. Hummel*, 2017 UT 19, 393 P.3d 314, and that "it is not [the court's] practice to give instructions just on statements of the law." Based on this interaction, Granere asserts that "the unanimity issue was raised and considered by the court" and is therefore preserved.

¶30　In support of his argument, Granere cites *Kell v. State*, 2012 UT 25, 285 P.3d 1133, in which our Supreme Court rejected the State's argument that an issue was not preserved because the State, and not the appellant, was the party to raise the issue before the district court. *Id.* ¶¶ 10–12. In so ruling, the Court stated that "the two primary considerations underlying the preservation rule are judicial economy and fairness." *Id.* ¶ 11 (quotation simplified). Concerning judicial economy, the Court noted that the district court in that case "not only had an opportunity to rule on the issue . . . , it did rule on it" after conducting "a thoroughgoing analysis of the" issue. *Id.* And regarding fairness, the Court noted that "[t]he State quite obviously had the opportunity to counter the argument in the district court." *Id.* ¶ 12. Based on these considerations, the Court held "that the issue was properly preserved." *Id.* The current case is distinguishable.

¶31　Here, unlike in *Kell*, the trial court did not conduct "a thoroughgoing analysis of the" issue before ruling. *Id.* ¶ 11. Instead of addressing the merits of the State's requested instruction—which Counsel did not oppose—the court side-stepped the issue by stating that "the instructions already adequately address those issues." Neither the State nor Counsel offered pushback to this resolution of the motion. Furthermore, because Counsel did not oppose the requested instruction, the State did not have "the opportunity to counter the argument [Granere now raises on appeal] in the district court." *Id.* ¶ 12. *See id.* ("Notions of fairness dictate that a party should be given an opportunity to address the alleged error in the trial court. Having been given such a chance, the party opposing a claim of error might have countered the argument.") (quotation simplified).

Thus, where in *Kell* the judicial economy and fairness considerations weighed in the appellant's favor, they weigh in the State's favor here.

¶32 For these reasons, we hold that Granere's unanimity argument was not preserved. But because Granere alternatively argues that Counsel was constitutionally ineffective for failing to request a proper unanimity instruction, we proceed to address the unanimity argument through that lens.[9]

2.      Merits of the Argument

¶33 The Utah Constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. This requirement of unanimity "is not met if a jury unanimously finds only that a defendant is guilty of a crime." *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951. *See State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 (stating that it is insufficient for a jury to find "only that a defendant is guilty *of a crime*" and render "a generic 'guilty' verdict that does not differentiate among various charges") (emphasis in original; quotation otherwise simplified). Rather, it "is well-established in our law" that a jury must be unanimous "as to a specific crime" and "on all elements of a criminal charge

_____

9. Granere also argues that the trial court plainly erred in not properly instructing the jury on unanimity. Because we hold that Counsel was ineffective for not requesting a proper unanimity instruction and reverse Granere's rape of a child and aggravated sexual abuse of a child convictions on that ground, we reach his plain error claim only as it relates to his remaining conviction for object rape of a child. And because, as discussed in greater detail below, Granere was not prejudiced by the absence of a proper unanimity instruction as it relates to that conviction, *see infra* note 13, his plain error argument related to this conviction also necessarily fails. *See State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699 ("[T]he prejudice test is the same whether under the claim of ineffective assistance or plain error.").

for a conviction to stand." *Hummel*, 2017 UT 19, ¶¶ 28–30 (quotation simplified). Thus, "where the evidence indicates that more than one distinct criminal act has been committed but the defendant is charged with only one count of criminal conduct, the jury must be unanimous as to which act or incident constitutes the charged crime."[10] *State v. Case*, 2020 UT App 81, ¶ 21, 467 P.3d 893 (quotation simplified), *cert. denied*, 474 P.3d 948 (Utah 2020). To that end, "[w]here neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *State v. Alires*, 2019 UT App 206, ¶ 23, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020).

¶34 Here, the State charged Granere with one count each of rape of a child, object rape of a child, and aggravated sexual abuse of a child. The elements instructions included the general statutory definitions for each charge, *see* Utah Code Ann. §§ 76-5-402.1 (rape of a child), -402.3 (object rape of a child), -404.1 & -404.3 (collectively, aggravated sexual abuse of a child) (LexisNexis Supp. 2022),[11] and provided that the offenses were alleged to have occurred between August 1, 2013, and April 1, 2014, but the instructions did not "conclusively link[] the allegations to the counts listed in the instructions," *State v. Baugh*,

---

10. For example, a verdict would not be unanimous if "some jurors found a defendant guilty of a robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though . . . all the jurors together agreed that he was guilty of some robbery." *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951.

11. Because the applicable provisions of the Utah Code in effect at the relevant time do not differ from those currently in effect in any way material to this appeal, we cite the current version of the code for convenience.

2022 UT App 3, ¶ 17, 504 P.3d 171, *cert. granted*, 525 P.3d 1257 (Utah 2022). Another instruction generally informed the jury that its "verdict must be unanimous," but it did not, as required by our caselaw, "instruct[] the jury that it must agree as to which criminal acts occurred." *Alires*, 2019 UT App 206, ¶ 23.

¶35   At trial, only one allegation of object rape was presented to the jury.[12] Beth testified that Granere gave her a blue Gatorade to drink that caused her to feel "weird" and "uneasy." She then testified that Granere took her to the bathtub, placed a "little silver object" in her hand, and told her to insert it in her vagina. Because Beth did not want to do this, he took her hand, "rubb[ed] his hand and [her] hand, and put[] it" "inside the skin folds" of her vagina. He then pushed the object further into her vagina, causing Beth to feel a "stinging" and "burning" sensation and to bleed.[13] Beth did

---

12. As relevant here, under the first element of the offense, "[a]n actor commits object rape of a child if . . . the actor causes the penetration or touching, however slight, of the genital or anal opening of the individual by . . . (A) a foreign object; (B) a substance; (C) an instrument; or (D) a device[.]" Utah Code Ann. § 76-5-402.3(2) (LexisNexis Supp. 2022).

13. Other than fleetingly suggesting as much in the fact section of his brief, Granere has not offered argument supported by reasoned analysis that Granere's directing the silver object "inside the skin folds" of Beth's vagina before pushing it further in constituted two separate acts of object rape of a child. *See* Utah R. App. P. 24(a)(8). But even assuming, without deciding, that it did constitute two separate acts, Granere's claim of ineffective assistance related to that conviction nonetheless fails for lack of prejudice.

As an initial matter, physical evidence tended to corroborate Beth's testimony of object rape of a child. *See generally Strickland v. Washinton*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been

(continued…)

not testify to any additional instances of abuse that would constitute object rape of a child.[14] Accordingly, a more specific unanimity instruction was not required, and Counsel did not perform deficiently with respect to that charge.

¶36 But the jury did hear testimony of more than one alleged act that supported the rape of a child and the aggravated sexual abuse of a child charges. Concerning aggravated sexual abuse of

---

affected by errors than one with overwhelming record support."). Furthermore, because the evidence supporting that conviction was not "readily subject to different interpretations," we are not persuaded that the members of the jury would have found that one act occurred but not the other. *See State v. Alires*, 2019 UT App 206, ¶ 29, 455 P.3d 636 ("Where the evidence is so readily subject to different interpretations, we are not persuaded that the jury would have unanimously convicted had the error not existed.") (quotation simplified), *cert. denied*, 466 P.3d 1076 (Utah 2020). Indeed, Beth's account of what transpired in the bathtub remained consistent between her CJC interview and her trial testimony, aside from the detail of whether the object was grey or silver. For these reasons, even assuming the jury heard two separate allegations of object rape of a child, we are not convinced that Granere would have received a more favorable outcome as concerns that conviction if the jury had been properly instructed on unanimity. *See Strickland*, 466 U.S. at 694.

14. Beth testified that Granere later took her from the bathtub and placed her on his bed, where he, among other things, inserted his fingers into her vagina. Although digital penetration does constitute object rape when perpetrated against a victim who is 14 years or older, *see* Utah Code Ann. § 76-5-402.2(2)(a)(ii)(E), (2)(b) (LexisNexis Supp. 2022), it does not when the victim falls below that age bracket, *see id.* § 76-5-402.3(2)(b). But it can constitute sexual abuse of a child or aggravated sexual abuse of a child, depending on the circumstances. *See id.* §§ 76-5-404.1(2), -404.3(2).

a child,[15] Beth testified that the first time Granere abused her, he took her from the bathtub and sat her on his bed. There, he inserted his fingers into her vagina, rubbed "the top part of [her] vagina," and ran his hands up and down her waist, touching her breasts and buttocks. Additionally, in the CJC interview, the recording of which was entered into evidence, the jury heard Beth recount that Granere touched her breasts on other occasions. Lastly, depending on whether the jury interpreted "it" to mean the silver or grey object or Granere's hand, it is also possible that the act of "rubbing his hand and [her] hand and putting it on . . . the top of [her] vagina," "inside the skin folds," before pushing the silver object into her vagina likewise constituted aggravated sexual abuse of a child.

¶37 Concerning the rape of a child conviction, Beth testified at trial that Granere raped her "many times."[16] And in the CJC interview that was played for the jury, Beth told interviewers that Granere would pin her down by her arms and place his penis in her vagina, which she estimated happened "[l]ike five, seven times." The jury also heard Beth testify at trial regarding two specific instances that supported that charge. She testified that the instance she most vividly recalled occurred after Granere massaged her with baby oil and offered her another drink that caused her to feel sleepy. She stated that the next thing she

---

15. As relevant here, under the first element of the offense, "an actor commits sexual abuse of a child if the actor . . . (A) touches the anus, buttocks, pubic area, or genitalia of any child; (B) touches the breast of a female child; or (C) otherwise takes indecent liberties with a child." *Id.* § 76-5-404.1(2)(a). *See id.* § 76-5-404.3(2)(a) (providing the circumstances under which sexual abuse of a child is elevated to aggravated sexual abuse of a child).

16. "An actor commits rape of a child if the actor has sexual intercourse with an individual who is younger than 14 years old." *Id.* § 76-5-402.1(2)(a).

remembered was waking up to Granere on top of her with his penis in her vagina, causing her to feel "a burning sensation." Then, when asked specifically whether that was the instance of Granere inserting his penis into her vagina she remembered best, Beth responded that it was but then she stated that there was another instance she remembered that occurred at the cabin. She then proceeded to recount the time when Granere woke her up and told her, "I stuck it in all the way."

¶38　Although the jury was generally instructed that its verdict must be unanimous, it was not instructed "that it must be unanimous as to the specific act underlying each count of conviction." *Alires*, 2019 UT App 206, ¶ 12. Such an instruction was "critical to ensuring unanimity." *Id.* ¶ 23. Otherwise, because more than one allegation was presented at trial supporting the rape of a child and aggravated sexual abuse of a child charges, "the jurors could have completely disagreed on which acts occurred or which acts were illegal, even if they all agreed that abuse had occurred at some point," *State v. Mottaghian*, 2022 UT App 8, ¶ 56, 504 P.3d 773 (quotation simplified), *cert. denied*, 525 P.3d 1256 (Utah 2022), thereby effectively lowering the State's burden of proof at trial, *see Alires*, 2019 UT App 206, ¶ 25. And this court has repeatedly held that failure to request a proper unanimity instruction constitutes deficient performance. *See, e.g.*, *State v. Garcia-Lorenzo*, 2022 UT App 101, ¶ 40, 517 P.3d 424, *cert. granted*, 525 P.3d 1263 (Utah 2022); *Baugh*, 2022 UT App 3, ¶ 19; *Alires*, 2019 UT App 206, ¶¶ 24–25.[17] Thus, as to those two

---

17. In *State v. Alires*, 2019 UT App 206, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020), this court also considered the State's closing argument telling the jury it could convict the defendant on four counts of aggravated sexual abuse of a child "based on any of the six alleged touches of the [victim] in 'any combination,'" *id.* ¶ 22, when it held that "[b]y failing to require juror unanimity as to each underlying act, the instructions—coupled with the prosecutor's closing argument—effectively lowered the State's

(continued…)

convictions, Counsel performed deficiently by not requesting a proper unanimity instruction. But because the jury heard only one allegation constituting object rape of a child, a more detailed unanimity instruction than what was already provided was not required as to that charge. As previously noted, Counsel therefore did not perform deficiently, and Granere's claim of ineffective assistance with respect to his object rape of a child conviction fails.

¶39 But to prevail on a claim of ineffective assistance of counsel with regard to his convictions for rape of a child and aggravated sexual abuse of a child, Granere must also show prejudice.[18] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We hold that Granere has established prejudice as to these convictions.

¶40 Concerning the conviction for rape of a child, as discussed above, the jury heard evidence of two specific incidents supporting that charge, as well as claims that Granere raped Beth

---

burden of proof," *id.* ¶ 25. But this court subsequently clarified that although the

> statement by the prosecutor in *Alires* was ill-advised and probably made the problem worse[,] . . . the problem existed with or without the comment by the prosecutor: the jury needed to be instructed, either way, that it had to unanimously agree on the specific criminal act underlying each count of conviction.

*State v. Garcia-Lorenzo*, 2022 UT App 101, ¶ 38, 517 P.3d 424, *cert. granted*, 525 P.3d 1263 (Utah 2022).

18. Granere asserts that because this argument involves a constitutional error, the State bears the burden of showing that the "error was harmless beyond a reasonable doubt." Although this is true for preserved constitutional errors, *see State v. Silva*, 2019 UT 36, ¶ 22, 456 P.3d 718, "for unpreserved constitutional claims," as is the case here, "the burden of demonstrating prejudice rests on the defendant," *id.*

"many times." Additionally, the evidence supporting that conviction was limited to Beth's testimony,[19] and therefore was "not so overwhelming that we can conclude that the jury must have unanimously agreed on [one] act—as opposed to [another] alleged act . . .—as the basis for its conviction" on that count. *Baugh*, 2022 UT App 3, ¶ 22. *See Strickland*, 466 U.S. at 696; *Alires*, 2019 UT App 206, ¶ 28. "It is therefore entirely possible that some (but not all) of the jurors convicted on [that count] based on the belief that the alleged [rape] occurred at the [cabin], while some other (but not all) jurors convicted based on the belief that the [rape] occurred at the apartment." *Baugh*, 2022 UT App 3, ¶ 21. For these reasons, we hold that as to his conviction for rape of a child, Granere has demonstrated that he was prejudiced by Counsel's failure to request a more specific unanimity instruction.

¶41   The same is true for Granere's conviction for aggravated sexual abuse of a child. The evidence supporting this conviction "was not overwhelming," the testimony "was conflicting . . . as to which acts occurred," and "the surrounding circumstances were sufficiently ambiguous." *Alires*, 2019 UT App 206, ¶¶ 28–29. Although there was physical evidence which might have supported Beth's allegation of digital penetration on the bed,[20] there is also a notable discrepancy concerning Beth's account of the sexual abuse that occurred at that time. Namely, the jury heard

---

19. Although there was physical evidence of sexual abuse of Beth in the form of two healed hymenal transections, the State told the jury during closing argument that such injuries were attributable to the object rape Granere perpetrated against her. This assertion is consistent with Beth's testimony that the object rape caused her to bleed and that the digital penetration that followed caused her to bleed even more. Thus, as concerns the rape of a child charge, that physical evidence is of limited relevance.

20. But, as noted above, during closing argument the State attributed the healed transections to the object rape committed in the bathtub and not to the digital penetration. *See supra* note 19.

Beth state during the CJC interview that she did not remember what happened after Granere took her from the bathtub to the bed but that Granere told her the next day, "Oh didn't you remember? We had sex." But at trial, Beth was able to recall what happened on the bed—testifying that Granere inserted his fingers into and rubbed her vagina, ran his hands up and down her waist, and touched her breasts and buttocks—she did not state that Granere raped her at that time. Furthermore, Beth's testimony was ambiguous as to whether Granere's hand touched her vagina while in the bathtub, and the evidence of the other times Granere allegedly touched her breasts is limited to her CJC interview; Beth made no such allegation at trial. For these reasons, we are persuaded that Granere was also prejudiced as to his conviction for aggravated sexual abuse of a child by reason of Counsel's failure to request a proper unanimity instruction.

¶42    The State argues that any prejudice Granere may have suffered due to the lack of a proper unanimity instruction was alleviated by the prosecutor's closing argument. Specifically, the State contends that during closing argument, the prosecutor "identified only . . . one act of rape as the basis of the child-rape count" and asked that the jury convict on the aggravated sexual assault of a child charge based only on the series of touches that occurred when Granere took Beth from the bathtub to the bed.[21]

¶43    Although the State may sometimes alleviate the prejudice resulting from the failure to properly instruct a jury on unanimity

---

21. Although each separate touch that occurred on the bed constituted "a separate offense of sexual abuse of a child," *State v. Alires*, 2019 UT App 206, ¶ 21, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020), the State argues that Granere nonetheless was not prejudiced because there was no "reason for the jury to differentiate between the alleged touches and disagree about which, if any, occurred." But because the jury heard allegations supporting that charge that occurred at other times, *see supra* ¶ 36, we need not address this argument.

by providing such guidance "in closing argument or elsewhere," *see State v. Garcia-Lorenzo*, 2022 UT App 101, ¶ 49, 517 P.3d 424, *cert. granted*, 525 P.3d 1263 (Utah 2022), the State must do so by "clearly identif[ying] for the jury which factual circumstance formed the basis for [the] charge," *State v. Paule*, 2021 UT App 120, ¶ 48, 502 P.3d 1217, *cert. granted*, 525 P.3d 1257 (Utah 2022). *See Garcia-Lorenzo*, 2022 UT App 101, ¶¶ 49, 52; *Alires*, 2019 UT App 206, ¶ 22. For example, in *Paule*, 2021 UT App 120, the State was able to cure the prejudice suffered by the lack of an adequate unanimity instruction when the prosecutor told the jury during opening argument "that the obstruction count was for when . . . Paule took that shotgun, and threw it off the balcony in order to hinder, delay, or prevent the investigation," and during closing argument "the prosecutor reemphasized that the obstruction charge was for when Paule threw the gun over the balcony." *Id.* ¶ 45 (quotation simplified). Such clarification did not occur here.

¶44　During closing argument, the prosecutor summarized the three relevant counts as follows: "Count one being rape of a child. Now, there what we're talking about is him putting his penis inside of her vagina. Count two, object rape of a child is him putting an object inside of [Beth's] vagina. Count three, him touching her breasts, buttocks, or vagina[.]" The prosecutor then proceeded to discuss the elements of each charge.

¶45　Regarding the rape of a child charge, the prosecutor generally explained that the State was required to prove that Granere "intentionally, knowingly, or recklessly had sexual intercourse with" Beth and stated, "[W]e've heard [Beth] tell you what happened to her all of those years ago, and so it'll come down to credibility." In arguing that the prosecutor "identified only one act of rape as the basis of the child-rape count" during closing argument, the State points to a portion of the prosecutor's argument in which he described the object rape Granere perpetrated on Beth in the bathtub. In that context, the prosecutor stated that following the object rape, Granere next brought Beth "into the bedroom, [laid] her on the bed, and then put[] his penis

inside of her."[22] But more is required than mere mention of a specific allegation supporting a charge at some point during closing argument. The State must "ma[ke] clear, in closing argument or elsewhere, which act went with each count." *Garcia-Lorenzo*, 2022 UT App 101, ¶ 49. *See Paule*, 2021 UT App 120, ¶ 48. Here, the prosecutor did not tell the jury that it was limited to considering only that specific allegation of rape. Thus, the prosecutor's closing argument did not alleviate the prejudice as to that conviction.

¶46 Concerning the aggravated sexual abuse of a child charge, the prosecutor told the jury that an element of the charge involved touching "the anus, buttocks, or genitals of [Beth], even accomplished through the clothes, although we heard that it was skin and skin as he climbed on top of her and then rubbed up her body, touching her breasts and her buttocks and also put his fingers on her vagina." Although this statement did reference the episode of touching that occurred on the bed and although it was made in the context of discussing the elements for that charge, the

---

22. We note that this summation is inconsistent with Beth's trial testimony. She stated that while on the bed, Granere inserted his fingers into her vagina, rubbed the top of her vagina, and rubbed her breasts and buttocks—but she did not testify that he raped her on that occasion. When she finished recounting what occurred on the bed, the State asked whether Granere inserted anything else into her vagina. Beth responded, "He put his penis and his tongue." But when prompted to "[t]ell us about that," Beth asked, "What one?" After the State specified "[h]is putting his penis inside you," Beth proceeded to tell of the incident of rape that occurred on a different occasion after Granere massaged her with baby oil.

But in her CJC interview, which was played for the jury, Beth told the interviewers that although she could not remember what happened after Granere took her from the bathtub to the bed, he told her the next day that they "had sex." The State may have thus been referring to that account when it made this statement.

statement likewise fell short because it did not "*clearly* identif[y] for the jury" that that specific "factual circumstance formed the basis for [the] charge." *Paule*, 2021 UT App 120, ¶ 48 (emphasis added). In other words, the prosecutor did not expressly tell the jury that it could consider only that allegation for the aggravated sexual abuse of a child charge. For this reason, the State's argument likewise fails as it relates to that conviction.

¶47 In summary, because Granere has not shown that Counsel performed deficiently with regard to his conviction for object rape of a child, that claim of ineffective assistance of counsel fails. But he has established that that he received ineffective assistance related to his convictions for rape of a child and aggravated sexual abuse of a child. We therefore reverse those convictions and remand to the trial court for further proceedings, but we proceed to address Granere's remaining arguments on appeal as they relate to his conviction for object rape of a child.

B. Objection to Beth's Testimony as Unreliable and Incompetent

¶48 Granere argues that because "there were competency and reliability issues with [Beth's] allegations due to substantial memory issues and an inability to recall and articulate the alleged events," her testimony was inadmissible under rules 602 and 403 of the Utah Rules of Evidence. Accordingly, he argues that Counsel was ineffective for failing to seek exclusion of Beth's testimony on those grounds. We disagree.

¶49 "Utah law imposes a very low bar for establishing the competency of a witness." *State v. Calliham*, 2002 UT 87, ¶ 22, 57 P.3d 220. Under rule 601, "[e]very person is competent to be a witness unless [the Utah Rules of Evidence] provide otherwise." Utah R. Evid. 601(a). Rule 602 includes one such limitation, stating that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In other words, a witness who

does not "have the opportunity and the capacity to perceive the events in question" may not testify. *State v. Eldredge*, 773 P.2d 29, 33 (Utah 1989).

¶50    Here, in support of his contention that Beth's inadequate memory rendered her testimony incompetent and unreliable, Granere points to Beth's CJC interview in which, he asserts, Beth "repeatedly said she didn't remember clearly and intimated that she was having 'flashbacks.'" For example, he points to "when first asked to describe one of the times from beginning to end, [Beth] responded she couldn't 'really remember that much' and speculated that Granere offered her a soda, it tasted like it had some kind of pill in it, she didn't know what it was, but she 'can't remember everything.'" Granere asserts that Beth "repeatedly reported not remembering, and [she] theorized she forgot because the pills would make her forget or knock her out." And at one point, she told the interviewers, "I remember half of what happened. Holy crap. Why does that keep happening to me? Every time it's like a word or something, I remember something." She also stated, "Now that I'm older I understand more, and it's like coming back to (inaudible) memories."

¶51    Granere contends that these "admitted memory gaps indicate that [Beth] lacked the capacity to 'observe' even assuming she had the 'opportunity' by being physically present." Quoting *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 8, 264 P.3d 752, Granere further asserts that Beth's "attempt to fill her memory gaps with speculation or claims of memories being 'triggered' long after the events 'does not provide the required foundation to show that [she] had the opportunity or the capacity to observe at the time the event occurred, or that [she] is now able to recall whatever [she] may have observed at the time.'" But the unique facts present in *Ladd* distinguish it from the current case.

¶52    In that case, the plaintiff was involved in three automobile accidents in quick succession, causing him to suffer "several substantial injuries including six brain contusions." *Id.* ¶¶ 2–3.

Because of this, the plaintiff "had no memory of the accidents until four to six months later when he purportedly relived the accidents in a dream." *Id.* ¶ 3. In the lawsuit for negligence that followed, the plaintiff described in a deposition "the details of his dream, explaining that his account of the accident is actually him reliving his dream," *id.* ¶ 4 (quotation simplified), and that, "putting the dream aside, he otherwise had absolutely no recollection of the accidents," *id.* ¶ 8. The district court ruled that the plaintiff's testimony regarding his dream of the accident was inadmissible and granted summary judgment in the defendants' favor. *Id.* ¶ 5. This court affirmed, holding that the plaintiff's testimony regarding his dream was inadmissible under rule 602 because his "attempt to fill his memory gap with the contents of a dream he experienced several months after the events does not provide the required foundation to show that he had the 'opportunity' or the 'capacity' to observe at the time the event occurred, or that he is now able to recall whatever he may have observed at the time." *Id.* ¶ 8. *See State v. Van Oostendorp*, 2017 UT App 85, ¶ 16, 397 P.3d 877 ("[T]he rule of *Ladd* is that a witness cannot testify to a matter of which she has no memory.").

¶53      Here, unlike in *Ladd*, Beth did not testify concerning events that she did not remember. To the contrary, although Beth struggled to recount certain events during the CJC interview, she was able to recall other specific instances of abuse. For example, she told the interviewers of the instance of object rape Granere perpetrated against her in the bathtub. She also stated that Granere repeatedly pinned her down by her arms and raped her. There is also no indication that Beth's account of the abuse was based on a dream or other form of speculation—as was the case in *Ladd*. Rather, Granere's challenge to Beth's testimony seems to be based on the fact that she had some lapses in memory.

¶54      Our Supreme Court has expressly rejected rule 602 as a means of rendering a child sexual assault victim's testimony inadmissible for lapses in memory. *See Eldredge*, 773 P.2d at 33 (rejecting the argument that under rule 602, "testimony of a

witness must be excluded if the witness's memory of the subject matter of the testimony is less than complete"). *See also* R. Collin Mangrum & Dee Benson, Mangrum & Benson on Utah Evidence 468 (2020–2021 ed.) (stating that "an incomplete memory should seldom provide a basis for holding the witness incompetent" under rule 602). Instead, the Court held that "in a case dealing with the competency of a child sexual abuse victim, . . . lapses in memory are appropriately dealt with under Utah Rule of Evidence 403, which provides for the exclusion of testimony so unreliable that its potential for unfair prejudice substantially outweighs its probative value." *Eldredge*, 773 P.2d at 33–34. *See State v. Fulton*, 742 P.2d 1208, 1218 & n.15 (Utah 1987). Thus, because under established precedent a motion to exclude Beth's testimony under rule 602 would have proven unsuccessful, Counsel did not perform deficiently by not objecting to her testimony on that ground. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶55   Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "[I]n determining the probative value and possible unfair prejudice of a child's testimony" under rule 403, the trial court may consider several factors, including "the age of the child at the time the relevant events occurred, the amount of time that has elapsed, and the degree of recollection the child demonstrates." *Fulton*, 742 P.2d at 1218 n.15. The court may also "take into account the child's susceptibility to suggestion and whether the child has been intentionally prepared or unconsciously influenced by adults in such a way that it is likely the child is only parroting what others have said about the relevant facts." *Id.*

¶56   But Granere's argument that Counsel was ineffective for failing to object to Beth's testimony under rule 403 is limited to the

mere assertion that "[m]any of these factors cut against the admissibility of [Beth's] testimony under Rule 403." Granere does not support this assertion with any analysis. Without more, Granere has not carried his burden of persuasion on this issue, *see Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903; Utah R. App. P. 24(a)(8), and we do not discuss it further.

C.      Video of Beth's CJC Interview

¶57     Next, Granere contends that Counsel was ineffective for playing Beth's "unreliable and inadmissible" CJC interview for the jury over the State's objections. At trial, Counsel indicated that the recording of the CJC interview—and not just the transcript—was "critical" because he intended to use it "to show the jury" and "to keep track of the times [Beth] laughs" and "focuses on the camera." The State objected to the recording, asserting that it was not admissible under rule 15.5 of the Utah Rules of Criminal Procedure because Beth was "no longer under the age of 14."[23] The State further argued that "unless there is some other valid reason under the rules for which [the recording] should be played, it shouldn't be played" and suggested "that just merely playing the CJC interview could be a problem going forward." In response, Counsel assured the court that he was "very concerned" about "alienating the jury" and he had "all the same concerns that we all have here." The trial court granted Counsel's request, and as part of his cross-examination of Beth, Counsel played the entire 43-minute interview for the jury, pausing over 50 times to ask Beth whether she had giggled or looked at the camera at a particular instance. And during closing argument, Counsel tallied that Beth had giggled 52 times and focused on the camera 22 times but did not cry once.

---

23. "[R]ule 15.5 of the Utah Rules of Criminal Procedure provides a procedure whereby the recorded testimony of children under the age of fourteen may be played to a jury." *State v. Bragg*, 2013 UT App 282, ¶ 20, 317 P.3d 452. *See* Utah R. Crim. P. 15.5(a).

¶58    Following his conviction, Granere moved for a new trial arguing, in relevant part, that Counsel was ineffective for playing the CJC interview for the jury. The court rejected this argument, holding that whether the recording was admissible under rule 15.5 was irrelevant because Counsel "did not seek to admit the video under Rule 15.5." Rather, "Counsel sought to admit the video to show that [Beth] was . . . not sympathetic . . . or was not believable, that she giggled or played to the camera numerous times during the interview." Accordingly, the court determined that Counsel did not perform deficiently because he "had a strategy for undermining [Beth's] credibility" by emphasizing her unserious behavior "while reporting alleged abuse." The court further held that "a reasonable basis supported [this] strategy." We agree.

¶59    Granere contends that Counsel's "tactic was not objectively reasonable." *See State v. Ray*, 2020 UT 12, ¶ 34 n.7, 469 P.3d 871 ("When inquiring whether counsel may have had a sound trial strategy, it must fall within the wide range of reasonable professional assistance. An objectively unreasonable strategy will not suffice.") (quotation simplified). He asserts that Beth's behavior during the interview could be explained away as a "nervous laugh" and "had the likely effect of fostering sympathy for the child." He further argues that "[i]t was not reasonable to expose the jury to a young child making damning accusations, and maintaining those accusations in the face of intensive cross-examination" or "to admit evidence of statements made in that interview that were consistent with [Beth's] trial testimony and which plausibly supported the elements of the State's case."

¶60    Although playing the recording for the jury posed a risk of backfiring, and although another attorney might have decided against doing so, we cannot say that Counsel's tactical decision to challenge Beth's credibility by playing the CJC interview was objectively unreasonable. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense

attorneys would not defend a particular client in the same way."). Although Beth's demeanor during the CJC interview could be attributed to nerves, Counsel's interpretation of her behavior was likewise plausible. Counsel also indicated that he had carefully weighed the risks and benefits of this tactic. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 96, 267 P.3d 232 ("[R]easonably informed strategic choices are almost unassailable."). Finally, because a significant portion of the State's case against Granere hinged on Beth's credibility, Granere stood to benefit from Counsel's gambit if it proved successful and Beth's demeanor during the CJC interview negatively affected her credibility in the eyes of the jury.

¶61 For all these reasons, Counsel's decision to play the recording of the CJC interview at trial was not objectively unreasonable and he therefore did not perform deficiently in so doing.

### D. Prosecutorial Misconduct

¶62 Granere argues that Counsel was ineffective for failing to object to several instances of prosecutorial misconduct during closing argument.[24] "Counsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (amended opinion) (quotation simplified). Furthermore, "the law recognizes the prerogative of opposing

---

24. Granere raised this claim of ineffective assistance in his motion for a new trial. The trial court rejected his argument, concluding that "the prosecution's comments . . . were not outside the wide latitude afforded parties in closing argument" and that "[a]ny irregularity in the comments was not prejudicial" because "the jurors here were instructed that an attorney's statement in closing argument is not evidence, and they were instructed that they must rely on their collective recollections of the evidence in reaching a verdict."

counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314. Thus, when reviewing "an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *Houston*, 2015 UT 40, ¶ 76 (quotation simplified). We hold that Counsel did not perform deficiently when he did not object to any of the alleged instances of prosecutorial misconduct recounted below.

¶63    First, Granere contends that the State misrepresented to the jury that Beth consistently recounted what Granere did to her and where he did it, stating, "From the time that she told [the interviewers] at the CJC interview, to the time she came in here, took that stand, and told you her truth and it's the same." Granere also asserts that for the State "to repeatedly maintain that [Beth's] consistency proved that she was telling 'her truth' crossed the line." But reasonable counsel could have chosen to forgo an objection and instead counter the State's assertion by pointing out the inconsistencies in Beth's account, which is exactly what Counsel did here. Counsel directly addressed the State's claim of consistency, stating, "And [the prosecution] says, there's no change in this trial [compared to what] she said in the CJC interview. Wait, wait, wait." Counsel then proceeded to recount how the number of allegations between the CJC interview and trial rose from "seven times" to "countless times." Counsel also stated that because Beth could go to Granere's apartment "only if someone picks her up and takes her over," and Mother testified that she did so only "two to three times," Granere could not have sexually abused Beth "countless times," as Beth asserted at trial. Because we cannot say that such a course of action fell outside "the wide range of reasonable professional assistance" and amounted to "an objectively unreasonable strategy," Counsel did not perform deficiently in pursuing this course of action. *See*

*State v. Ray*, 2020 UT 12, ¶ 34 n.7, 469 P.3d 871 (quotation simplified).

¶64 Second, Granere asserts that in light of the fact that "[t]he defense sought and was denied the opportunity not only to obtain the medical records from" Beth's hospital visit on the night of her tenth birthday party, but also "to present an alternative source of [the] injury," the State committed prosecutorial misconduct when it "specifically argued that Granere was the one who caused the transection to [Beth's] hymen, and told the jury this corroborated [Beth's] word." Granere also complains that during rebuttal, in response to the defense's argument that the injury likely occurred on the night of Beth's hospital visit, the State told the jury that she was examined "and everything's normal." But Granere cites no legal authority, nor are we aware of any, in support of his contention that it is improper during closing argument for the State to discuss physical evidence that was the subject of an unsuccessful rule 412 motion. Furthermore, the two transections were physical evidence that corroborated Beth's testimony that she was sexually abused, and she pointed her finger at Granere as the perpetrator of the abuse. Thus, the State was fully within its right to discuss admissible evidence from its perspective along with all the "inferences and deductions" the evidence supported. *Houston*, 2015 UT 40, ¶ 76 (quotation simplified).

¶65 Counsel was likewise free to, and did, contend during closing argument that the fact that Beth was hospitalized for vaginal complaints—whatever the cause—on the night of her tenth birthday party suggested that Granere was not the source of the physical injuries. And it was in this context that the State rebutted Counsel's argument by stating that "they examined her and everything's normal." This statement did not go as far as to falsely assert that Beth underwent a vaginal exam—which she did not—that revealed no transections, as Granere appears to suggest. Rather, the statement can also readily be interpreted to mean that the general examination Beth underwent did not spark concerns that Beth suffered any specific trauma to her

genital region that night. As such, the statement also did not fall outside the wide latitude afforded the State during closing argument.

¶66 Third, Granere argues that the State went too far when it offered a theory on rebuttal as to why Beth did not immediately disclose the sexual abuse to Mother. The State told the jury that because there must have been discussion of menstrual periods when Beth went to the hospital with complaints of pain, cramps, and spotting, Beth might have believed that the vaginal bleeding and pain she experienced as a result of the object rape was "a period" and might have thought, "I don't want to go back to this. I don't need to tell my mom. It's a period." Granere asserts that "[n]one of that theory was supported by any evidence, however, and was fully contrived from the prosecutor's imagination." But Counsel could have reasonably believed that such a statement fell within the wide latitude afforded each side during closing argument. It was clear that the State was merely offering a theory as to why Beth might not have immediately disclosed the sexual abuse—it did not offer the assertion as a statement of fact. And such a theory had a basis in evidence the jury heard at trial, i.e., that Beth had gone to the hospital with complaints of pain, cramping, and vaginal spotting and that, in light of the symptoms, it was likely that periods were discussed. Additionally, reasonable counsel could believe that an objection was not necessary because the theory appeared to be too far-fetched to convince the jury, especially in light of Counsel's extensive argument that Beth's failure to more timely disclose the abuse went against "human experience."

¶67 Because none of the challenged statements "were so inflammatory that [C]ounsel's only defensible choice was to interrupt those comments with an objection," *Houston*, 2015 UT 40, ¶ 76 (quotation simplified), Counsel did not perform deficiently by not objecting during the State's closing argument.

## II. Rule 412 Evidence

¶68    Prior to trial, Granere filed a motion under rule 412 of the Utah Rules of Evidence seeking to admit evidence that Uncle had sexually abused Beth and that he—and not Granere—had caused the two transections to Beth's hymen. In May 2018, the trial court held an evidentiary hearing on the motion at which Granere, Mother, and Beth testified.

¶69    Granere testified that in mid-October 2013, some two weeks into his relationship with Mother, both he and Uncle attended Beth's tenth birthday party. Granere stated that toward the end of the party, Uncle asked Mother if he could tuck Beth and her two younger siblings into bed and Mother agreed. Granere did not hear "any noises" or screaming during that time. Granere testified that Uncle reappeared half an hour later and left the party in a hurry shortly thereafter.

¶70    The next day, Granere saw a picture Mother posted on social media of Beth in a hospital bed looking "like she's in pain." Granere stated that he texted Mother, who told him that Beth was experiencing "a lot of cramping pain" and that she suspected Beth had started menstruating for the first time. Mother later told Granere that Beth had not, in fact, started her period that night and that Beth "had just been spotting." But Granere testified that as the text message conversation progressed, Mother told him "that there was a history with" Uncle and that she felt uncomfortable it had taken Uncle half an hour to tuck the children into bed. Granere stated that Mother then told him that Uncle had raped her when she was in her teens and that, at a later point, she told him that Uncle had been arrested for violating parole because he had been around his girlfriend's children. Granere stated that he subsequently looked up Uncle online and discovered that he was a convicted sex offender.

¶71    Mother testified that despite Uncle being a convicted sex offender, she allowed him to babysit her children from May 2013,

when she first moved to Salt Lake City, until November 2013, when he was arrested for violating parole. She explained that she had no concerns about Uncle being alone with her children because she trusted him. She denied that Uncle ever sexually abused her when they were younger and stated that she never would have allowed him to watch her children if that had been the case. Mother also denied ever telling Granere that Uncle had raped or sexually abused her. Rather, she stated that she had told him that Uncle "used to beat me up." She also did not recall Uncle asking to tuck Beth and her siblings into bed on the night of the party.

¶72 Mother stated that she took Beth to the hospital on the night in question because Beth was experiencing "pains in her stomach," cramping, and vaginal spotting. At the time, she thought that Beth might be starting her period, but she confirmed that that did not turn out to be the case. She stated the hospital never determined the cause of Beth's complaints.

¶73 Beth testified last. She stated that she did not remember her tenth birthday party but confirmed that she did not start her period at that time. She remembered that she was given an IV at the hospital and was certain that hospital staff did not perform a vaginal exam on her. Beth denied that Uncle ever touched or inserted anything into her vagina.

¶74 At the conclusion of the evidentiary hearing, the trial court denied Granere's rule 412 motion. The court ruled "that the evidence fails to support that [Uncle] was the source of the injury, and there is no basis for allowing the evidence" at trial. It also found Beth's testimony that Uncle never sexually abused her to be credible. The court further ruled that even if the evidence was admissible under rule 412, its admission at trial was nonetheless precluded by rule 403 because it was not "relevant to a material factual dispute" and because it "would be confusing and misleading."

¶75   Ten months later, in March 2019, Granere moved to continue the trial based on newly discovered evidence relating to his rule 412 motion. He alleged that he uncovered Adult Probation & Parole records in which Uncle admitted that Mother "was a past victim of his when they were juveniles" and that "on multiple accounts he held her down and raped her." Granere argued that this new evidence directly contradicted Mother's denial at the evidentiary hearing that Uncle sexually abused her. The trial court denied this motion, ruling that the newly discovered evidence did not alter its prior analysis because it did "not support that Uncle attacked" Beth nor did it "contradict [Beth's] testimony . . . that Uncle never touched her vagina or put anything into her vagina."

¶76   Following his convictions, Granere raised this issue a third time in a motion for a new trial. In that motion, Granere included a declaration from an investigator stating that Uncle's girlfriend told him that Uncle babysat Beth and her siblings overnight and that a victim of Uncle's told the investigator that Uncle had sexually abused her and another girl when they were around Beth's age. The motion also included a declaration from Granere stating that a fellow inmate who had served time with Uncle told him that Uncle admitted to sexually abusing Mother and that he was "getting away with uncharged sexual assault." The declaration also stated that a second inmate had speculated that Uncle's niece was the victim of the uncharged assault.

¶77   The court denied this motion. It first addressed Granere's argument that the court should not have made any credibility determinations at the evidentiary hearing. Although it acknowledged that it did make credibility determinations, the court "clarif[ied] that ruling" by stating that Granere's theory that Uncle sexually abused Beth was "speculative." The court also reiterated that "[p]retrial evidence was insufficient to support the admissibility of [Granere's] theory." Specifically, it stated that "when the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the

fact does exist" and that here "that proof was insufficient." The court further stated that even taking all Granere's assertions "at face value"—i.e., that Uncle sexually abused Mother, that Mother permitted Uncle to babysit her children overnight, that Uncle violated parole by being near his girlfriend's children, that Uncle was at Beth's tenth birthday party and he tucked her into bed that night, that later that night Beth was admitted to the hospital due to pain and vaginal spotting, that Uncle sexually abused other child victims, and that Uncle was overheard speaking of another uncharged sexual assault that some speculated was perpetrated against Uncle's niece (Beth)—there was nonetheless "insufficient proof to support that [U]ncle was the source of [Beth's] injury in the case or that [U]ncle abused" her. The court stated that Granere's theory "relies on speculation, guesswork, and hearsay."

¶78    The court further stated that, in any event, "[t]he evidence and speculation concerning [U]ncle as the perpetrator or the source of [Beth's] injury is also inadmissible under Rule 403" because it was "confusing, misleading, distracting and time consuming" and "would amount to a trial within a trial against [U]ncle based only on conjecture."

¶79    On appeal, Granere argues that the trial court abused its discretion in excluding, under rules 403 and 412, evidence that Uncle sexually abused Beth and that he was the cause of the physical injuries that the State's evidence attributed to the object rape Granere allegedly perpetrated against Beth in the bathtub. Because we ultimately affirm the court's exclusion of the evidence under rule 403, we have no need to address the court's ruling that the evidence was also inadmissible under rule 412.[25] *See* Utah R.

---

25. Rule 412(a) bars all evidence of an alleged victim's other sexual behavior unless an exception enumerated in rule 412(b) applies. *See* Utah R. Evid. 412(a)–(b); *State v. Steffen*, 2020 UT App 95, ¶ 15, 468 P.3d 568 (stating rule 412(a)'s prohibitions extend to

(continued…)

Evid. 412(b) (stating that a trial court may admit evidence that would otherwise be inadmissible under rule 412(a) if the evidence satisfies one of the enumerated exceptions and "if the evidence *is otherwise admissible under these rules*") (emphasis added).

¶80 Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* R. 403. Thus, in conducting a rule 403 analysis, courts generally "indulge a presumption in favor of admissibility."[26] *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 (quotation simplified).

---

"evidence concerning a victim's prior history of being sexually abused"), *cert. denied*, 474 P.3d 944 (Utah 2020).

26. Despite the general admissibility presumption, our Supreme Court has previously stated that "[w]hen applying rule 403 to the admissibility of a rape victim's past sexual conduct, there is a presumption of inadmissibility," *State v. Boyd*, 2001 UT 30, ¶ 41, 25 P.3d 985, under which "such evidence is admissible only when the court finds under the circumstances of the particular case such evidence is relevant to a material factual dispute and its probative value *outweighs* the" dangers enumerated in the rule, *id.* (emphasis added; quotation otherwise simplified). As noted, this stands in contrast to the presumption of admissibility applied in the typical rule 403 analysis, *see State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930, which is derived from the rule's plain language that the probative value of the evidence must be "*substantially outweighed*" by an enumerated danger to be excluded, Utah R. Evid. 403 (emphasis added).

But because the Court has "recently 'repeatedly eschewed extra-textual or contra-textual judicial glosses on the Utah Rules of Evidence,'" *State v. Rallison*, 2023 UT App 34, ¶ 25 n.7, 528 P.3d

(continued…)

¶81    Granere mainly argues that the trial court abused its discretion in excluding the rule 412 evidence because it was "highly probative of material factual issues"—i.e., the cause of the two hymenal transections—and because "any ostensible prejudice to the alleged victim was minimal" and the "risk of unfair prejudice was low." But this argument does not directly address the court's rulings. Specifically, in denying Granere's rule 412 motion, the trial court ruled that the evidence was inadmissible under rule 403 because it "would be confusing and misleading." And in denying his motion for a new trial, the court stated that in addition to being "confusing and misleading," the evidence was also inadmissible under rule 403 because it would be "distracting and time consuming" and "would amount to a trial within a trial against [U]ncle based only on conjecture." The court's ruling was entirely silent as to unfair prejudice or potential prejudice to Beth. Thus, Granere's arguments on this point miss the mark and are irrelevant to our review of the court's decision.

¶82    Granere briefly addresses the court's actual rule 403 analysis by stating that "the evidence at issue would not have unduly diverted the focus of the trial or confused the issues" but "[i]nstead the use of this evidence went to one of the paramount issues in this case—Did Granere engage in the alleged sexual activity with [Beth] and cause this child's hymenal injury as stressed by the State?" But this bare assertion that the evidence simply would not have been distracting, without any supporting

---

1235 (quoting *State v. Biel*, 2021 UT 8, ¶ 25, 484 P.3d 1172), and because "an application of rule 403 that presumes inadmissibility for rule 412 evidence is not indicated in the plain language of rule 403," "we are not certain whether this presumption continues to be applicable, and we wait for the supreme court to weigh in on this issue," *id.*

   In the interim, because we are able to conclude that the trial court did not abuse its discretion in excluding the rule 412 evidence under the typical rule 403 analysis, we need not address this question further. *See id.*

argument or analysis, is insufficient to carry Granere's burden of persuasion on appeal that the trial court abused its discretion in weighing the probative value of the evidence against the potential that the evidence would be confusing, misleading, distracting, and time-consuming. *See* Utah R. App. P. 24(a)(8). This is especially the case where our standard of review is highly deferential. *See State v. Ashby*, 2015 UT App 169, ¶ 31, 357 P.3d 554 ("We allow trial courts considerable freedom in applying rule 403 to the facts" and "will not overturn the trial court's ruling on the application of Rule 403 unless the abuse of discretion is so severe that it results in a likelihood of injustice.") (quotation simplified), *cert. denied*, 363 P.3d 523 (Utah 2015). *See also State v. Rallison*, 2023 UT App 34, ¶ 26, 528 P.3d 1235 ("Sexual evidence presented under rule 412(b)(2) may have a propensity to distort the jury's deliberative process, thereby confusing or misleading the jury.") (quotation simplified).

¶83 Accordingly, we affirm the trial court's exclusion under rule 403 of Granere's proffered rule 412 evidence.

### III. Inherent Improbability

¶84 Appellate courts "are not normally in the business of reassessing or reweighing evidence, and . . . resolve conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). An exception arises in certain "unusual circumstances" such as "when witness testimony is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id.* (quotation simplified). *See State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288 ("A conviction not based on substantial reliable evidence cannot stand.") (quotation simplified). Such a claim "is difficult to successfully establish" on appeal. *State v. Cady*, 2018 UT App 8, ¶ 18, 414 P.3d 974, *cert. denied*, 421 P.3d 439 (Utah 2018).

¶85 In determining whether a witness's testimony is inherently improbable, "the proper test is . . . whether reasonable minds must

have entertained a reasonable doubt that the defendant committed the crime." *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665 (quotation simplified). To aid in the inherently improbable analysis, "three factors that merit consideration" are "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.* But courts are to avoid an "inflexible reliance on these factors." *Id.* Indeed, "a sufficiency of the evidence claim, including a showing that testimony cannot support a finding of guilt, is not sustained by merely meeting enumerated criteria considered in a previous case." *Id.* ¶ 36. "Rather, when weighing the testimony in light of the other evidence, the testimony of the witness must run so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* (quotation simplified).

¶86 In denying Granere's motion to arrest judgment on inherent improbability grounds, the trial court held that the evidence the State presented was "sufficient to support each element of each offense where the jury convicted." It further held that although there were some "inconsistencies and disputes in" Beth's testimony, "those inconsistencies and disputes were presented to the jury, and the jury was left to sort it out and to assess the credibility and the weight of the evidence." Based on its first-hand experience at trial, the court stated that Beth's testimony was "not incredibly dubious, absurd, impossible, or self-contradictory, or inconsistent such that [it] should disregard the jury's verdict." It also noted that Beth's testimony was not physically impossible and that it was corroborated by physical injuries.

¶87 On appeal, Granere argues that Beth's testimony was inherently improbable because it was both physically impossible and because it contained both patent inconsistencies and inherently false statements. We disagree.

¶88 Granere asserts that Beth's testimony regarding any sexual abuse that occurred at the cabin was physically impossible

because this claimed "abuse took place . . . during the winter months when the cabin had been shut down for the season" and because he "was being monitored on a GPS ankle monitor during the relevant time frame."[27] But Granere's assertion that the cabin was inaccessible at the time the abuse was alleged to have occurred is wholly dependent on his father's testimony, which the jury was free to disbelieve. *See State v. Torres*, 2018 UT App 113, ¶ 20, 427 P.3d 550 ("The jury is free to believe or disbelieve all or part of any witness's testimony[.]") (quotation simplified). Indeed, in addition to Beth's testimony, Mother also testified that Granere twice took her and Beth to the cabin. Mother testified that Granere once took Beth snowmobiling near the cabin. Thus, in the face of contradictory testimony, the job fell to the jury to determine credibility and which account to believe.

¶89   Concerning the GPS ankle monitoring evidence, the detective stated that the ankle monitor would not have alerted authorities if Granere had gone to the cabin during times that he was supposed to be at work, and it was therefore possible for Granere to spend a day at the cabin so long as he was back to his Salt Lake apartment by curfew. Thus, although perhaps difficult, it was not physically impossible for Granere to have abused Beth at the cabin between mid-November 2013 and mid-March 2014.

¶90   Moreover, given the uncertain timeline of events, it is also possible, as the State points out, "that the jury could simply have squared any inconsistencies by finding that Beth's description of the years-old cabin abuse occurred before or after the timeframe identified by Granere's witnesses." In other words, the cabin was

---

27. Although Granere's object rape of a child was alleged to have occurred at his apartment and not the cabin, we address these challenges to Beth's testimony because Granere contends that "[t]he consistent falsehoods and wildly dramatic changes to the allegations rendered [her] testimony completely unbelievable" and it therefore should have been excluded in its entirety, including her allegations of object rape.

supposed to be winterized and Granere wore the GPS ankle monitor between November 2013 and March 2014. It was possible for the jury to find that the alleged abuse at the cabin took place sometime either before or after that time period. Indeed, the jury instructions provided that the offenses for which Granere was charged were alleged to have occurred between August 1, 2013, and April 1, 2014.[28]

¶91     Next, in arguing that Beth's testimony contained patent inconsistencies and inherently false statements, Granere asserts that she exhibited an "ever changing 'memory'" in that the "[t]he number and frequency of the alleged instances of abuse changed throughout the duration of the investigation as well as during the trial itself" and that "the time frame was also an ever-moving target." Granere points to four instances of this.

¶92     First, he asserts that Beth "initially reported in the CJC interview that touching occurred over clothes," but "[a]t trial, the accusations morphed into countless rapes in both the Salt Lake apartment and at the cabin." But Beth reported much more than over-the-clothes touching during the CJC interview, including object rape and several instances of vaginal rape. Thus, this assertion is incorrect. And in any event, additional allegations of abuse made after a child's initial disclosure does not render the child's testimony inherently improbable. *See State v. Wells*, 2014 UT App 13, ¶ 9, 318 P.3d 1251 ("[T]he simple fact that Child alleged additional abuse later does not make Child's testimony inherently improbable."). To the contrary, such disclosures are

---

28. The jury instructions are somewhat wide of the mark concerning when the sexual abuse could have begun as Granere did not meet Mother until September 2013. But Granere was introduced to Beth as early as mid-October when he attended her tenth birthday party. This allowed at least a two- or three-week period during which Granere could have sexually abused Beth at the cabin prior to it being winterized and the GPS ankle monitor being placed on him.

"merely cumulative, and simply add[] more details in the later statements." *Id.* We thus see no material inconsistency here.

¶93    Second, Granere states that Beth "reported to [Nurse] that Granere forced her to lick his penis," but "[a]t trial, [Beth] instead testified Granere licked her vagina." But these statements are also not materially inconsistent. Beth's trial testimony that Granere "put his . . . tongue" on her vagina does not contradict her earlier statement to Nurse that "she had to lick his penis" as the two acts are not mutually exclusive. Rather, as discussed above, the additional disclosures of abuse were cumulative. *See id*. But even if the two statements were inconsistent—which they are not— "the fact that a witness's trial testimony is somewhat at odds with other evidence in the case, including perhaps that witness's own prior statement, is not enough to render that testimony inherently improbable." *State v. Carrell*, 2018 UT App 21, ¶ 53, 414 P.3d 1030 (quotation simplified), *cert. denied*, 425 P.3d 801 (Utah 2018). Indeed, "[t]he question of which version of [a witness's story] was more credible is the type of question we routinely require juries to answer." *State v. Prater*, 2017 UT 13, ¶ 39, 392 P.3d 398.

¶94    Third, Granere asserts that "on the eve of trial, completely new allegations were made of anal penetration." At the time, Counsel lodged an objection to this additional allegation and the State stated, "To be honest, she doesn't want to talk about it anyway. So if they're willing to forego talking about it, so will we." Thus, the court excluded evidence of that allegation. But again, this was merely an additional disclosure and, for the same reasons already discussed, this allegation was cumulative and did not amount to a material inconsistency.

¶95    Fourth, Granere states that Beth's timeline of the abuse has been inconsistent. He points out that during the CJC interview, Beth told officers that the abuse started some two or three months into Mother and Granere's seven-month relationship and ended around the time they broke up. But at certain points during trial, Beth testified that the abuse occurred over "the course of one to

two years."[29] This is the sole inconsistency alleged on appeal that constitutes a material inconsistency. But in cases of child sexual abuse, such an inconsistency, alone, does not rise to the level of inherent improbability. *See State v. Robbins*, 2009 UT 23, ¶ 22, 210 P.3d 288 (stating that the child's "inconsistent accounts regarding the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse may alone be insufficient to invoke the inherent improbability exception"); *State v. Virgin*, 2006 UT 29, ¶ 38, 137 P.3d 787 ("[I]t is not unusual that a child's testimony be somewhat inconsistent, especially in sexual abuse cases."); *State v. Dever*, 2022 UT App 35, ¶ 36, 508 P.3d 158 ("Inconsistencies in a child's testimony could be explained by her age and lack of sophistication.") (quotation simplified); *Wells*, 2014 UT App 13, ¶ 10 ("[I]nconsistency alone does not necessarily make a child's testimony inherently improbable."). Here, Beth was ten years old at the time the abuse began and thus, any inconsistency regarding the timeline of abuse can readily be attributed to her young age. Accordingly, her testimony was properly presented to the jury to consider any dispute in the evidence and to weigh her credibility. *See Prater*, 2017 UT 13, ¶ 39.

¶96 Lastly, Granere does not engage with the evidence presented at trial corroborating Beth's allegations of sexual abuse.

---

29. Granere also asserts that at another point, Beth testified that the abuse occurred "until the end of fifth grade" around May 2016, which would have been impossible because Granere was living in Arizona at that time. But there was clearly some confusion as to dates at that point. Beth's CJC interview was held in March 2016, but Beth asserted at trial—which was held some three years later in 2019—that she was in sixth grade at the time of the interview, not fifth. It is thus more likely that Beth intended to state that the abuse lasted until 2015, which is consistent with the account that despite Mother's and Granere's romantic relationship ending in March or April 2014, they continued to have contact with Granere until October 2015.

In denying Granere's motion to arrest judgment, the trial court discussed that the jury heard evidence corroborating Beth's testimony. Specifically, the court pointed to evidence of the two hymenal transactions that "were consistent with penetrating abuse." Although this corroborating evidence of abuse does not support every aspect of Beth's testimony, it does lend credence to her allegation that she was sexually abused. *See State v. Skinner*, 2020 UT App 3, ¶ 34, 457 P.3d 421 ("Corroborating evidence sufficient to defeat [an inherent improbability] claim does not have to corroborate the witness's account across the board, in every particular. It just has to provide a second source of evidence for at least some of the details of the witness's story."), *cert. denied*, 462 P.3d 805 (Utah 2020).

¶97 In sum, with the exception of the inconsistencies concerning the timeline of abuse, Granere's challenges to Beth's testimony do not amount to physical impossibilities or material inconsistencies. Additionally, the jury was presented with physical evidence corroborating Beth's testimony that she was sexually abused. For these reasons, Beth's testimony did not rise to the level to which "reasonable minds must have entertained a reasonable doubt that the defendant committed the crime," *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665 (quotation simplified), and Granere's inherent improbability challenge therefore fails.

## IV. Cumulative Error

¶98 Granere also argues that the cumulative effect of multiple errors was prejudicial. "A reviewing court will reverse a jury verdict under the cumulative error doctrine only if the cumulative effect of the several errors undermines confidence that a fair trial was had." *State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17 (quotation simplified). *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 40, 428 P.3d 1038 (stating that the cumulative error "doctrine will not be applied when claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm") (quotation simplified). Because we see no error as concerns

Granere's remaining conviction for object rape of a child, there are no errors to cumulate, and the doctrine is inapplicable.

CONCLUSION

¶99    Because Counsel was ineffective for failing to request a proper unanimity instruction, we reverse Granere's convictions for rape of a child and aggravated sexual abuse of a child and remand for further proceedings on those counts. But because Granere's conviction for object rape of a child withstands all his challenges on appeal, we affirm that conviction.

————————