2025 UT App 76

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
EDWY JIMENEZ,
Appellant.

Opinion
No. 20220662-CA
Filed May 22, 2025

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 201100304

Freyja Johnson and Melissa Jo Townsend,
Attorneys for Appellant

Derek E. Brown and Marian Decker,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 A jury found Edwy Jimenez guilty of sexually abusing his seven-year-old stepdaughter. Jimenez appeals his conviction, asserting among other things that his trial attorney provided ineffective assistance by electing not to seek a jury instruction that specifically directed the jurors that they needed to unanimously agree on which act formed the basis for conviction on his sole criminal charge. We find merit in Jimenez's argument, and we therefore reverse his conviction and remand this case to the trial court for further proceedings, including a new trial.

## BACKGROUND[1]

### *Penny's Home Life*

¶2    Penny was five years old when her parents divorced. Penny's mother (Mother) married Jimenez about a year later, and at that time, Penny lived "full-time" with Mother, Jimenez, Penny's older sister (Lydia), and Jimenez's five children. She also lived "part-time" with her father (Father) and stepmother (Stepmother). After Mother married Jimenez, the blended family moved into a six-bedroom house. There, Penny shared a room with one of Jimenez's children (Lucy[2]), who was about the same age as Penny. The two had a close relationship; Mother described them as being "together by the hip all the time." During this time period, Mother worked during the day and was home in the evenings; Jimenez also worked during the day and was home in the evenings and sometimes in the afternoon. To help take care of

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Thomas*, 2019 UT App 177, n.1, 474 P.3d 470 (cleaned up). Recognizing, however, that our reversal of Jimenez's conviction causes the presumption of innocence to reattach, *see Betterman v. Montana*, 578 U.S. 437, 441 n.2 (2016) (observing that "upon renewed prosecution following a defendant's successful appeal," the defendant "again enjoys the presumption of innocence"), we apply the foregoing standard somewhat guardedly here. Specifically, concerning the facts surrounding the charged crimes, we identify the evidence that supports the verdict, while refraining from characterizing the alleged criminal conduct as established fact.

2. "Penny," "Lydia," and "Lucy" are all pseudonyms.

the children after school, Jimenez's mother (Grandmother) was at the home "[a]lmost every day."

¶3 Penny's shared custody was a point of contention between Mother and Father. Mother recalled that she and Father "never got along," that they "always fought over custody," and that there was "a lot of contention between" them. On occasion, some of the adults aired their frustrations in front of Penny; for instance, Penny described how Stepmother told her that Mother and Father divorced because Mother "cheated" on Father, that "the only reason that [Mother] wanted to keep [Penny] and [Lydia] in her house was because [Father] was paying child support and she wanted the money," and that Mother was "bipolar" and refused "to take her medications." Additionally, there were differences between the two homes concerning parental oversight; Mother explained that she had "very strict rules on drugs, alcohol, and being with friends," whereas Mother's perception was that, at Father's house, "there was . . . nobody to monitor that." Jimenez later offered his view that, as between the two home environments, Penny and Lydia believed that his and Mother's "house wasn't fun enough" and "wasn't a place where [Penny and Lydia] had everything they wanted."

*Allegations of Abuse*

¶4 When Penny was about nine years old, she disclosed to Stepmother that Jimenez had once "laid on top of her when she was laying on her bed." Penny did not describe this instance in detail, but she told Stepmother that while Jimenez lay on top of her, he "breathed into her ear," and that when Penny "asked him to get up, he kind of chuckled." Stepmother told Penny to tell Mother, but Penny said she was hesitant to do so because she was "afraid" of Mother and "afraid that it wouldn't do anything."

¶5 But Penny eventually told Mother that Jimenez had made her feel "uncomfortable." Penny remembered that she disclosed

this to Mother while she was in the car with Mother and Lydia as they were driving back from a visit with Father. When they arrived back at Mother and Jimenez's house, Mother called Penny into Mother and Jimenez's bedroom to talk about it. Penny recalled that when she went in, Jimenez was "leaning against the dresser crying," Mother was standing by the bed, and Lydia was sitting on the bed. Mother asked Jimenez to explain what had happened, and Jimenez said that he had "laid on top of" Penny because she "was being goofy." Mother then asked Penny to tell her more about what happened, and although Penny did not later remember what she told Mother in that moment, Lydia remembered that Penny said Jimenez "made [her] feel uncomfortable and he touched [her]." Lydia recalled that Jimenez responded by crying and stating that "[he] should leave, [that his] kids [were] going to hate [him]" and were "going to think [he was] an awful person." Mother responded by telling Penny that she "must have been dreaming" and that she was "delusional" or "making stuff up." Despite these disclosures, no one reported Penny's allegations to law enforcement at that time.

¶6 Eventually, when Penny was about eleven years old, she moved in with Father and Stepmother on a more permanent basis. By that point, Lydia had already moved in with Father; there had been an altercation involving Mother and Lydia during which Mother had been "very physical" and for which Mother was charged with a misdemeanor. Mother sent Penny to live with Father to finish the school year because Penny's school had shifted to an online format in the wake of the COVID-19 pandemic and Mother could not supervise her while working during the day. During this time, Penny began to prefer living with Father because, as she would later explain, it was "a healthier environment" and she didn't get "yelled at" as much.

¶7 It was around this time that Penny told her school counselor (Counselor) that Jimenez had sexually abused her years earlier. As part of Penny's school, her fifth-grade teacher

(Teacher) started an online discussion forum for students to talk about how they were doing during the pandemic, and Penny posted that Mother was "abusing, still kinda is." Concerned, Teacher set up a video call with herself, Counselor, and Penny. Teacher did not recall Penny mentioning in that call that Mother or Jimenez had abused her. But Penny asked if she could email Counselor, and shortly after the call, Counselor received an email (the Email) from Penny stating, among other things, that Jimenez had "tried to rape" her. The Email stated:

> So I haven't told my mom this but it happened two years ago. So my stepdad, [Jimenez], he tried to . . . rape me? He would always call me to his room and say I didn't give him a hug that day. Although I did. However, I was little and didn't know what he was doing. I would give him a hug and then he would grab me and put me on the bed in front of him. I told my mom, but I didn't know it was rape. But she didn't believe me. And now I'm kind of scared of [Jimenez] . . . . [Lucy] knows about it. I don't know what to do.

*Investigation*

¶8    Counselor reported Penny's allegations to the Utah Division of Child and Family Services (DCFS), prompting an investigation. A few days later, Penny was interviewed at the Children's Justice Center (CJC), where she disclosed to the interviewer (Interviewer) that Jimenez "tried to rape" her. Penny stated that "all the kids were in the living room, [Mother] was at work and [Jimenez] was in his room watching" television. Penny further stated that Jimenez "[called her] in the room and he said that [she] didn't give him a hug that day," even though she had. Penny explained that she "gave him a hug and then he . . . [made her] go on the bed and then [went] behind [her]" and that she

"was there for, like, an hour or two." Interviewer then asked Penny to recount the alleged instance of abuse from the beginning, including "every[] single thing that happened." Penny responded that she "would go into the room and then . . . he would grab [her] and throw [her] on the bed" and "would go behind [her]." Penny said she thought that the door was closed, and when Interviewer asked who had shut the door, Penny responded that "it was a crack open." Interviewer asked what would happen next; Penny answered, "He just stayed there . . . and like, kind of went back and forth." Penny told Interviewer that this happened "like every day" and that after school, "the kids would be in the living room watching shows or playing their videogames, and then [Jimenez] would call [her] in and then he would do it." Interviewer sought clarification, asking, "Do what exactly?," and Penny answered, "The moving up and down."

¶9     Penny also told Interviewer that "sometimes [Jimenez] did it in the middle of the night." She said that she "woke up to him in the doorway" of her bedroom. Penny also said that Stepmother told her that "what [Jimenez] was doing . . . was, like, called rape." Penny said that she hadn't initially told Mother that Jimenez had been "on top of [her]" because Mother would have "ha[d] to call the police" and Penny "felt guilty" about that. Later in the interview, Penny said she knew that Jimenez "was trying to have, you know, sex with [her]." And when Interviewer asked how she knew that, Penny said that Stepmother had "told [her] about it."

¶10    As the investigation continued, a law enforcement investigator asked Teacher to provide any documentation she might have regarding Penny's allegations. In response, Teacher produced a one-and-a-half-page single-spaced letter (the Letter) that Penny had sent to Teacher sometime after Penny's fifth-grade year. In the Letter, Penny told Teacher that she had experienced both physical and sexual abuse while living with Mother and Jimenez. Among other things, Penny stated that she was depressed and had been "crying a lot," that Mother had forced

one of Penny's stepbrothers to "kill both of [their] dogs with an axe because [the dogs] ate the chickens," and that the children "didn't have any food so [they] had to depend on [themselves]." Penny also recounted that, at Mother's house, the children were "yelled at constantly" and that they were "mentally" and "physical[ly] abuse[d]." Penny also described how, because of Mother, Penny "flinch[ed]" whenever Stepmother "raise[d] her hand or [made] a certain movement," even though Penny had "never been hit" at Father's house. Most notably, in the middle of a long paragraph about other things, Penny stated as follows: "I got [molested] when I was seven, up until I was nine by my stepfather." Finally, Penny stated that Mother did not believe her allegations of sexual abuse and that Mother had told Penny that her allegations were "ruining lives."

¶11    After completing its investigation, the State charged Jimenez with a single count of aggravated sexual abuse of a child, a first-degree felony.

*Trial*

¶12    On the first day of the three-day trial, before jury selection, the court discussed jury instructions with the attorneys. During this discussion, the court raised the issue of jury unanimity, noting that Jimenez had been charged with only a single count of abuse and offering its view that, if the State was going to argue that Jimenez "did it this time and this time . . . what if the jury says, well, [we] don't believe that time, but [we] do believe this and that," and that if one juror "believe[d] that time but not this time," there would be a problem. In response, the State acknowledged that Penny would indeed testify that sexual abuse "did happen multiple times," but it assuaged the court's concern by representing that Penny would "specify in detail" about only "one time" when the abuse happened. After this discussion, the parties moved on to other matters; Jimenez's trial counsel (Counsel) did not request a specific unanimity instruction.

¶13    In its opening statement, the State started by recounting the alleged abuse that occurred in Jimenez's bedroom. The prosecutor stated that Jimenez "called [Penny] into the bedroom to give her a hug," then "pulled her into the bed with him, spooned with her, and began to rub his penis back and forth on her bum." The prosecutor also told the jury that, "[i]n the next couple of years, this same sort of thing would happen multiple times, always when [Mother] wasn't around."

¶14    The second day of trial began with a conference outside of the jury's presence to again discuss proposed jury instructions, some of which discussed general jury unanimity. One of these stated that "every single juror must agree with the verdict before the defendant can be found 'guilty' or 'not guilty,'" another made clear that the jury "must be unanimous" in the "verdict for each count charged," and still another stated that the case "requir[ed] a unanimous agreement of all the jurors to find a verdict." But none of the proposed instructions informed the jury that it must unanimously agree on which specific act constituted the crime. Hearing no objection from either party regarding these proposed instructions, the court asked whether there was anything else either side wanted to address as to instructions, and both sides agreed to move forward. Counsel again made no request for a specific unanimity instruction.

¶15    The State then called Penny to the stand. She testified that Jimenez had sexually abused her, and she recounted the alleged abuse in Jimenez's bedroom in some detail. She testified that, one day after school, Jimenez was watching television on his bed when he called Penny into his bedroom, saying that she "hadn't given him a hug that day." Penny said that she had given him a hug but that Jimenez asked for another. Penny said that Jimenez then pulled her into a "spooning position" on the bed with her back "against his front" and proceeded to "grind[]" against her, rubbing his erect penis against her buttocks while she heard "heavy breathing." Penny stated that both she and Jimenez were

wearing clothes. She then testified that Jimenez did this to her "regularly," "[m]ore than multiple times," for about two years, when she was between the ages of seven and nine years old. Penny said that this usually occurred after school, while Mother was at work and the other kids were in other rooms in the house.

¶16 While Penny focused chiefly on the alleged abuse that occurred in Jimenez's bedroom, she also described abuse that she said occurred in other locations at different times. Penny testified that sometimes abuse occurred in her bedroom; she stated that "there were a couple of times where [she] would wake up in the middle of the night and feel him behind [her]," and then, thinking she might have been dreaming, she would "open [her] eyes again and [she] would see him in the doorway just watching [her]." And she described another specific occasion in which Jimenez "told [her] to kneel on the ground since [she] . . . had lice" and then proceeded to "spoon[] behind [her] and was grinding while he was combing through [her] hair."

¶17 The State also asked Penny about her statement to Counselor, in the Email, that she had been "raped." On that point, Penny testified that she had been "really confused" when she sent the Email to Counselor and had said "things that weren't really true because [she] didn't know what was going on and so [she] tried filling in spaces." She clarified that Jimenez had not "raped" her but that he "just molested" her. She explained that she used the word "rape" because, at the time, she thought "rape and molestation were basically the same thing."

¶18 On cross-examination, Penny acknowledged that there were differences between what she said in the CJC interview and her testimony at trial, explaining that "[n]ot all of" what she had said in the CJC interview was the truth. Counsel played clips from the CJC interview and questioned Penny about her answers in the interview. Specifically, Counsel questioned Penny about her statements to Interviewer that Jimenez had "thrown [her] on the

bed," that he had molested her for "an hour or two" while the bedroom door was "a crack open," and that he had lain on top of her instead of spooning behind her. Penny acknowledged some inconsistencies and explained that, in the CJC interview, she had sometimes "exaggerated."

¶19 The State also called Teacher, who testified that Penny was "on top of her academics" and "honest" but that she was "emotional sometimes" and seemed "more depressed than the average student." The prosecutor asked Teacher whether she had any records relating to Penny's report of abuse, and Teacher referred to the Letter. Counsel objected on hearsay grounds, and after a sidebar discussion, the court overruled the objection, ruling that the Letter was admissible as "rehabilitation" in response to Counsel's charge of Penny's "character inconsistency."[3] Teacher was then permitted to read the Letter aloud to the jury in its entirety, and the Letter was admitted into evidence as an exhibit.

¶20 Next, the State called Counselor, who had worked with Penny during her fourth- and fifth-grade years. Counselor explained that she "didn't see anything that was out of the ordinary with [Penny]" and that Penny was "a sweet girl, very polite." When the prosecutor asked about the Email, Counsel again objected on hearsay grounds. But the court overruled the objection, apparently persuaded by the State's arguments that the Email fell under the business record exception to the rule against hearsay or that the Email, like the Letter, was rehabilitative to

---

3. It's a touch unclear from the record, but it appears that the court was persuaded by the State's argument that "the purpose of the [L]etter [was] to show that . . . [Penny] ha[d] been consistent when she had discussed [the allegations of abuse] to the different people," and that the Letter was therefore admissible as a prior consistent statement. *See* Utah R. Evid. 801(d)(1)(B).

Penny's testimony. The Email was then admitted into evidence, and Counselor was permitted to read it aloud to the jury.

¶21    Lydia also testified. She explained in more detail why she went to live with Father, stating that she did not have any issues with Jimenez but that she moved to Father's house when she was sixteen because of a physical altercation with Mother. Lydia also recounted the instance where she, Mother, Jimenez, and Penny discussed Jimenez's alleged sexual abuse in Mother and Jimenez's room. Lydia did not claim to have witnessed any of Penny's alleged sexual abuse.

¶22    After the State rested and the jury exited the courtroom, the trial court asked Counsel whether he had "anything that [he] want[ed] to address." Counsel responded in the negative.

¶23    The trial continued, and Jimenez presented his defense. Jimenez first called Mother, who testified, among other things, that she didn't report Penny's allegations because Penny never said Jimenez "touched" her or that anything "inappropriate" happened. Rather, Mother testified that Penny said only that there were "uncomfortable situations," which Mother didn't think she needed to report. Mother also testified that Penny could not have been alone with Jimenez because Penny and Lucy were always together and there were other people in the house after school, including Grandmother who was there "[a]lmost every day."

¶24    Jimenez then took the stand in his own defense and denied Penny's allegations in their entirety, telling the jury that he had never been alone with Penny in his bedroom. He testified that when the children came home, he "would be working" and that Grandmother was "there all the time." On cross-examination, Jimenez recalled the bedroom discussion about the allegations and that Penny had been upset, but he denied crying or saying that he "need[ed] to leave." According to Jimenez, during the bedroom discussion, Penny and Lydia said that "they felt

uncomfortable" but apologized and said they didn't want "to make [Jimenez] feel bad." Jimenez said he responded by assuring them that he didn't "feel bad" and that they "shouldn't feel bad" or "feel uncomfortable," and that if they felt like they "need[ed] to say something, [they should] say it." And he testified that he had a good relationship with Penny.

*Final Jury Instructions and Closing Argument*

¶25 After the defense rested, the trial court provided the final set of instructions to the jury. Among these instructions were the general unanimity instructions discussed above. No instruction was given to the jury stating that it needed to unanimously agree as to the specific act that Jimenez committed that would result in conviction on the single charge of aggravated sexual abuse of a child. Nor did the jury receive a special verdict form.

¶26 During closing argument, the State addressed the elements of the crime of aggravated sexual abuse of a child. In doing so, the prosecutor discussed the alleged abuse where Jimenez "ha[d] [Penny] in the bedroom and he [was] spooning with her, rubbing his penis back and forth, up and down against her buttocks while he [was] heavy breathing." But the prosecutor also emphasized that the abuse happened repeatedly, stating that "this wasn't . . . a one-time thing" and that there were "multiple times" when Jimenez "would use a hug to get her in bed and then rub his penis on her bum." And later, the prosecutor repeated the assertion that this "happened multiple times." But at no point did the prosecutor tell the jury that its focus should be limited to abuse that occurred in Jimenez's bedroom.

¶27 Counsel's closing argument focused on inconsistencies in Penny's allegations over time and on the purported influence of Interviewer. Counsel argued that the CJC interview was meant to elicit words like "penis" and "sexual breathing," after which DCFS could conclude that it had "got[ten] what [it] need[ed]." In

particular, Counsel asserted that DCFS "got[] somebody to come in and say that this happened and then [it] pried and [it] dug and [it] suggested, and . . . now, [it] ha[d] sexual breathing, a penis is involved, . . . it happened multiple times." Counsel argued that "[n]one of those things were there when [Penny] first walked in" to the CJC interview. Counsel also argued that Father and Stepmother had influenced Penny and that, ultimately, there were "plenty of issues and drama that [was] going on here that [gave Penny] plenty of reasons to have made a false accusation."

¶28    The prosecutor then offered a rebuttal closing, challenging Counsel's points about the CJC interview and Counsel's argument that Penny was influenced to make a false accusation or was "mistaken" or "misremembering" the instances of abuse. The State again argued, "This wasn't just one incident. This was a pattern over a couple of years. This was something that [Penny] endured repeatedly." And here, the State indirectly alluded to the abuse that allegedly occurred in the other two locations—in Penny's bedroom and during the lice incident—stating as follows: "[T]he part that never really changes, is that he was rubbing his erect penis on her butt. She knew what happened. She's not mistaken about that. It wasn't like, man, all . . . these times this happened, I guess that's just a false memory. No."

¶29    After deliberation, the jury convicted Jimenez of one count of aggravated sexual abuse of a child. Later, the trial court sentenced Jimenez to prison.

ISSUE AND STANDARD OF REVIEW

¶30    Jimenez now appeals, arguing that Counsel rendered ineffective assistance by failing to request a specific unanimity jury instruction. "When an ineffective assistance claim is raised

for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257.[4]

## ANALYSIS

¶31  Jimenez asserts that Counsel rendered constitutionally ineffective assistance by not asking for a specific instruction regarding jury unanimity, one that would have informed the jury that it needed to reach unanimous agreement about which of the several acts alleged by Penny formed the basis for any eventual conviction on the single charged count. Jimenez points out that such an instruction was important in this case, because he was charged with only one count yet Penny alleged that abuse happened multiple times, including in three specifically described

4. In his appellate briefs, Jimenez raises several other issues. For instance, he challenges—on hearsay grounds—the trial court's decision to admit the Letter and the Email, and he raises additional ineffective assistance arguments. He has also filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, seeking an order remanding the case to the trial court for additional factfinding related to some of his other ineffective assistance arguments. Given our resolution of the jury unanimity issue, we need not reach any of Jimenez's other arguments. And while we retain the discretion to address some of those arguments for the purpose of giving guidance to the trial court on remand, *see, e.g.*, *State v. Valdez*, 2021 UT App 13, ¶ 54, 482 P.3d 861, *aff'd*, 2023 UT 26, 552 P.3d 159, we elect not to do so here, despite harboring certain reservations about the admission of the Letter and the Email in their entirety. The other issues Jimenez raises are, in our view, quite dependent on context, and these issues— should they arise on remand—will almost certainly be framed differently than they were in the first trial. We are thus not convinced that any guidance we might give on these other issues would necessarily be all that useful on remand.

locations and circumstances: (1) in Jimenez's bed in the afternoon after school, (2) in Penny's bed at night when she was asleep, and (3) at some point when Jimenez combed lice out of her hair.

¶32     We begin our analysis by reviewing the law on jury unanimity, and we conclude that Jimenez would have been entitled to a specific unanimity instruction had one been requested. We then transition to an analysis of whether Counsel rendered ineffective assistance by not making such a request. For the reasons discussed, we find merit in Jimenez's claim.

A

¶33     Our state constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. "At its most basic level, this provision requires the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. Additionally, it is "well-established" that our constitutional unanimity requirement "is not met if a jury unanimously finds only that a defendant is guilty *of a crime*." *Id.* ¶¶ 26, 30 (cleaned up). Our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* ¶ 26 (cleaned up). Indeed, "a generic guilty verdict that does not differentiate among various charges would fall short," as would "a verdict of guilty of some crime." *Id.* ¶¶ 26–27 (cleaned up).[5]

_____

5. For example, a verdict would not "be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery." *State v. Hummel*, 2017 UT 19, ¶ 28, 393 P.3d 314 (cleaned up).

¶34   In cases like this one, "where the evidence indicates that more than one distinct criminal act has been committed but the defendant is charged with only one count of criminal conduct," we have held that "the jury must be unanimous as to which act or incident constitutes the charged crime." *State v. Granere*, 2024 UT App 1, ¶ 33, 543 P.3d 177 (cleaned up), *cert. denied*, 558 P.3d 87 (Utah 2024). And "where neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *State v. Alires*, 2019 UT App 206, ¶ 23, 455 P.3d 636 (cleaned up), *cert. denied*, 466 P.3d 1076 (Utah 2020).

¶35   In *Alires*, the defendant was charged with "six identically-worded counts" of aggravated sexual abuse, the counts were not distinguished by act or by alleged victim, the complaining witnesses described more than six acts that could have qualified as abuse, and the jury convicted the defendant on only two counts. *See id.* ¶¶ 22–23. In that situation, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," even if they all agreed that abuse had occurred at some point. *Id.* ¶ 23. Although the court gave the jury a general instruction that its verdict needed to be unanimous, *id.* ¶ 23 n.5, it did not "instruct the jury that it must be unanimous as to the specific act underlying each count of conviction," *id.* ¶ 12. In turn, we held that the jury should have been given a specific—and not just a general—unanimity instruction, stating that "the jury should have been instructed to agree on a specific criminal act for each charge in order to convict." *Id.* ¶ 22.

¶36   In this case, as in *Alires*, the State's presentation of the evidence called for a specific unanimity instruction. Even though the State had charged Jimenez with just one count of sexual abuse, it presented evidence that Jimenez had abused Penny "multiple times"; in particular, it elicited testimony from Penny that abuse had occurred in three different specific locations. Penny testified

that abuse had occurred in Jimenez's bedroom after school, but she also testified about a "couple of times where [she] would wake up in the middle of the night" in her own bedroom "and feel him behind [her]." In addition, Penny offered testimony about another occasion where Jimenez "spoon[ed] behind [her] and was grinding while he was combing through [her] hair" for lice. The elements instruction provided to the jury did not tell the jury which specific act was connected to the solitary charge, and there was no specific jury unanimity instruction informing the jury that it needed to agree unanimously about which act would form the basis for conviction.

¶37 And, as discussed more fully below, we reject the State's argument that, during the course of the trial, the prosecutor provided sufficient clarity on this point. To be sure, in opening and closing arguments, the prosecutor discussed the actual details of only one of the specific locations and circumstances Penny had described: abuse that allegedly occurred in Jimenez's bedroom. But in both opening and closing arguments, the prosecutor asserted that abuse had occurred "multiple times," and he indirectly alluded to abuse that allegedly occurred in the other two locations—in Penny's bedroom and during the lice incident—by stating as follows: "[T]he part that never really changes, is that he was rubbing his erect penis on her butt." Significantly, at no point did the State attempt to limit the jury's consideration of charged criminal activity to a single actus reus. In this situation, as in *Alires*, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," even if they all agreed that abuse had occurred at some point. *Id.* ¶ 23.

¶38 In sum, given the manner in which this case was presented to the jury, Jimenez was entitled to a specific jury unanimity instruction[6] and—as indicated by the trial court's sua sponte

---

6. Indeed, the State makes no argument to the contrary.

flagging of the issue—would certainly have been granted one had Counsel made a request.

B

¶39    The issue presented here, then, is whether Counsel's failure to ask for a specific unanimity instruction constituted ineffective assistance.

¶40    To succeed on an ineffective assistance claim, Jimenez must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

1

¶41    We first address whether Counsel performed deficiently by not requesting a specific unanimity instruction. This first part of the test requires Jimenez to show that Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (cleaned up). In evaluating the reasonableness of an attorney's actions, courts will often look to whether the actions the attorney took were motivated by trial strategy. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead

whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶42 When the trial in this case occurred—April 2022—the law on jury unanimity was well established. *See Alires*, 2019 UT App 206, ¶ 19. We decided *Alires* well over two years before Jimenez's trial took place, and in the intervening period we applied the principles set out in *Alires* at least seven times. *See State v. Mottaghian*, 2022 UT App 8, ¶ 56, 504 P.3d 773; *State v. Baugh*, 2022 UT App 3, ¶ 15, 504 P.3d 171, *aff'd*, 2024 UT 33, 556 P.3d 35; *State v. Paule*, 2021 UT App 120, ¶ 42, 502 P.3d 1217, *aff'd*, 2024 UT 2, 554 P.3d 844; *State v. Mendoza*, 2021 UT App 79, ¶ 11, 496 P.3d 275; *State v. Gollaher*, 2020 UT App 131, ¶ 33, 474 P.3d 1018; *State v. Whytock*, 2020 UT App 107, ¶¶ 30–31, 469 P.3d 1150; *State v. Case*, 2020 UT App 81, ¶ 23, 467 P.3d 893; *see also State v. Baugh*, 2024 UT 33, ¶ 30, 556 P.3d 35 ("Relevant case law is one of several factors to consider in assessing the reasonableness of counsel's performance."). These cases stand for the proposition that when the State presents evidence that a defendant has committed more criminal acts than the number of charged counts, a jury unanimity concern may be present and an attorney may perform deficiently by not asking for a specific unanimity instruction.

¶43 However, our supreme court has recognized that declining to ask for such an instruction may not *always* constitute deficient performance, even when there are more criminal acts alleged than there are counts charged. *See State v. Paule*, 2024 UT 2, ¶¶ 68, 78, 554 P.3d 844. For instance, where the State, through "prosecutorial election," makes explicitly clear which act forms the basis of the specific charge during the presentation of its case, it may be reasonable for a defense attorney to rely on the State's clear identification and forgo a request for a specific unanimity instruction. *See id.* For example, in *Paule*, the State sought a conviction for one count of obstruction of justice, yet during the

trial it presented evidence of three separate acts that could have satisfied the elements of obstruction. *Id.* ¶ 69. But in that case, the State clearly identified the factual basis for the obstruction charge throughout trial—during its opening statement, again at the midway point of trial when contesting the defendant's motion for a directed verdict, and again during closing argument. *Id.* ¶ 74; *see also id.* ¶ 14 (quoting the prosecutor's statement, during closing, that the "obstruction of justice" count was for "when [Paule] threw the gun over the balcony"). At each juncture, the prosecutor expressly centered the obstruction of justice charge on the defendant's act of throwing a shotgun off the balcony of his residence, and "at no point during trial did the prosecutor ever argue that the obstruction count was for any act other than throwing the shotgun off the balcony." *Id.* ¶¶ 74–75 (cleaned up). Indeed, the other potentially obstructive acts were discussed only in connection with a separate (murder) charge in that case, not the obstruction charge. *Id.* ¶ 74. As a result, our supreme court held that defense "counsel's decision to rely on the State's clear identification of the shotgun evidence as the factual basis for the obstruction charge," and on that basis not to request a specific unanimity instruction, did not constitute deficient performance. *Id.* ¶ 68. The court offered its view that, under those circumstances, counsel's decision was reasonable because "if counsel had requested a more specific instruction, then the State's options for conviction of obstruction of justice could have expanded" to include the other acts as well. *Id.* ¶¶ 68, 76.

¶44 But for such a strategy to be reasonable, the State's "prosecutorial election" must be "clear." *Id.* ¶¶ 68, 78, 82–83. And in this case, the State's efforts to clarify things were insufficient.

¶45 When the trial court raised the issue of specific unanimity with the parties before trial, the State indicated that jury unanimity would not be a concern because, although Penny would testify that sexual abuse "happen[ed] multiple times," Penny would "specify in detail" about only "one time" when

abuse happened. It was arguably reasonable for Counsel to rely on this pretrial representation from the State and forgo—at least at that juncture—a request for a specific unanimity instruction. But the State did not follow through on its promise to pin down the charge to one specific event; instead, the evidence and argument it presented did not sufficiently clarify the issue.

¶46 During opening statements, the prosecutor discussed Penny's allegations that abuse occurred in Jimenez's bedroom, but did not tell the jury that the charged count was limited to that instance. Indeed, the prosecutor stated that, over "the next couple of years, this same sort of thing would happen multiple times, always when [Mother] wasn't around." Then, in its evidentiary presentation, the State elicited testimony from Penny in which she offered not only specific details about abuse that she said occurred in Jimenez's bedroom after school but also details about abuse that she claimed occurred in her bedroom at night and about abuse that she said occurred while Jimenez picked lice out of her hair. And during closing argument, while the prosecutor again discussed specific details only about alleged abuse that occurred in Jimenez's bedroom, he didn't limit his argument to that alleged abuse. Instead, he continued to emphasize that the abuse was "a pattern over a couple of years" that Penny "endured repeatedly," and he even impliedly referenced the other instances of abuse, stating that "the part that never really changes," no matter the circumstances, "is that he was rubbing his erect penis on her butt." Crucially, at no point did the State ever indicate to the jury that it should limit its consideration of criminal conduct to one specific incident of alleged abuse.

¶47 On several occasions, we have considered whether the State's efforts to be "clear" about its "prosecutorial election" are sufficient, and on that point we have stated that the State must do "more" than merely "mention . . . a specific allegation supporting a charge at some point during closing argument." *State v. Granere*, 2024 UT App 1, ¶ 45, 543 P.3d 177, *cert. denied*, 558 P.3d 87 (Utah

2024). Instead, "the State must make clear, in closing argument or elsewhere, which act went with each count." *Id.* (cleaned up). In *Granere*, for example, we held that the State's efforts were insufficient where the prosecutor referred to one particular episode during closing argument but didn't "clearly identify for the jury that that specific circumstance formed the basis for the charge" and didn't "tell the jury that it was limited to considering only [one] specific allegation of rape." *Id.* ¶¶ 45–46 (cleaned up).

¶48     Similarly, in *State v. Macleod*, 2024 UT App 32, 546 P.3d 366, *cert. denied*, 558 P.3d 87 (Utah 2024), we concluded that the State had not sufficiently clarified the issue because its closing argument "fell short of sufficiently and clearly instructing the jury regarding which act corresponded with" the charged crime. *Id.* ¶ 66. In that case, the State had charged the defendant with two counts of forcible sexual abuse, one for "touching of the breast" and the other for illegal "touching of the buttocks," both of which were alleged to have occurred on a basketball court. *Id.* ¶¶ 21, 23, 62 (cleaned up). Yet the jury heard testimony that the defendant touched the complainant's breasts and buttocks without her consent not just on a basketball court but also at a grocery store (breasts and buttocks) and in the complainant's bedroom (buttocks). *Id.* During closing argument, the prosecutor referenced the two counts of forcible sexual abuse as follows: "Count 3 and 4 are the same elements but for different actions. . . . [The complainant] and [another witness] described the defendant repeatedly touching and groping [the complainant's] bottom, specifically her breasts and buttocks. He did so [without consent] by being told to stop in the store and then being told to stop again while playing basketball." *Id.* ¶ 67 (cleaned up). Given the prosecutor's reference to the instance at "the store," we concluded that the State had failed to sufficiently clarify which acts went with the charged counts. *Id.* ¶ 69 (cleaned up). We explained that "[a]bsent the mention of 'the store' during that portion of closing argument, the statement likely would have mitigated any

prejudice resulting from [c]ounsel's deficient performance." *Id.* Yet, "the somewhat confusing reference to 'the store' muddied the waters, rendering the statement insufficiently clear to 'cure' the prejudice resulting from [c]ounsel's failure to request an adequate unanimity instruction." *Id.*

¶49 And in *State v. Garcia-Lorenzo*, 2022 UT App 101, 517 P.3d 424, we reached a similar conclusion. In that case, the complainant testified that the defendant had sodomized her on two occasions: in "the old house" prior to New Year's Eve, and in a new house on New Year's Eve. *Id.* ¶ 29. Yet the State charged the defendant with only one count of sodomy. *Id.* ¶ 11. No specific unanimity instruction was given. *Id.* ¶ 17. During closing argument, the prosecutor argued that, as to the sodomy charge, the State was "asking [the jury] to find the defendant guilty because of [the complainant's] statement that after" New Year's Eve, "she said that this happened before . . . when they lived in the other house." *Id.* ¶ 52 (cleaned up). We rejected the State's assertion that this argument sufficiently clarified the issue: "As opposed to clearly identifying which act formed the basis for the charge, this statement made reference to both asserted acts of sodomy." *Id.* (cleaned up). And we noted that "it is entirely possible (and perhaps even likely) that the jury simply understood the prosecutor to be saying that, because the sodomy allegedly happened on multiple occasions, it was *more likely* to have also happened on New Year's Eve." *Id.* On these facts, we concluded that "the State's closing argument did not—or, at least, not clearly enough—identify for the jury which factual circumstance or act served as the underlying offense for the sodomy charge." *Id.* ¶ 53.

¶50 As in these cited cases, the State's presentation at trial in this case did not—or, at least, not clearly enough—identify for the jury which act formed the basis for its single charge of aggravated sexual abuse of a child. To be sure, it spent more time discussing abuse that allegedly occurred in Jimenez's bedroom than it spent on the other incidents Penny described. But it continued to

emphasize that abuse occurred "repeatedly," and during its rebuttal closing argument it indirectly referenced the other alleged incidents, stating that "the part that never really changes," no matter the circumstances, "is that he was rubbing his erect penis on her butt." In summary, the State did not ever "expressly tell the jury that it could consider only" abuse that Penny said occurred in Jimenez's bedroom as the basis "for the aggravated sexual abuse of a child charge." *See Granere*, 2024 UT App 1, ¶ 46.

¶51 Thus, we conclude that the State's efforts to provide clarity during its presentation at trial were insufficient. In other words, the State's "prosecutorial election" was never "clear." *See Paule*, 2024 UT 2, ¶¶ 68, 78, 82–83. And for that reason, while it might have been reasonable for Counsel to rely on the State's assurances at the pretrial stage, any reliance Counsel might have placed on the promise of a "prosecutorial election" became unreasonable after the State never followed through on that promise.

¶52 Nevertheless, the State defends Counsel's decision not to request a specific unanimity instruction, asserting that Jimenez's "defense strategy here was all or nothing" because it turned on Penny having a false memory or a motive to fabricate all the allegations. Thus, according to the State, it was a reasonable strategy "to ask the jury to reject Penny's testimony in its entirety" rather than "ask the jury to parse Penny's testimony about each molestation for the one or more it unanimously agreed occurred." As an initial matter, we do not necessarily agree with the State's characterization of Counsel's argument as "all-or-nothing." To be sure, Counsel made arguments about Penny's memory and credibility that applied to all the incidents (rather than just some), but the State points to no place in the record where Counsel told the jury that it had to believe all of Penny's claims or none of them.

¶53 Requesting a specific unanimity instruction—at least absent a clear prosecutorial election—is not at odds with this sort of strategy. *Cf. Alires*, 2019 UT App 206, ¶ 25 (rejecting the State's

"theory that a reasonable defense attorney could have concluded that 'further clarification would have increased the likelihood of conviction'"); *Baugh*, 2024 UT 33, ¶ 40 (holding that "there was no strategic advantage to not requesting more specific unanimity instructions" where "[d]oing so would not have directed the jury to any especially damaging evidence"). In the absence of a clear election from the State, the jury is entitled to—and likely will— examine and consider all of the supported instances of abuse in considering whether to convict. Allowing the jury to do so without a specific unanimity instruction "effectively lower[s] the State's burden of proof." *See Baugh*, 2024 UT 33, ¶ 40; *accord Alires*, 2019 UT App 206, ¶ 25. And this holds true even if the defense attacks the complainant's credibility in ways that might apply to all the claimed incidents.

¶54 Indeed, a specific unanimity instruction often dovetails with such a strategy; after all, a witness's memory issues or motive to fabricate—while perhaps applicable at some level to all instances of alleged abuse—may be stronger or weaker for certain instances of abuse than for others, and a specific unanimity instruction requires the jury to focus on whether all the elements of a crime line up with specific instances of alleged conduct beyond a reasonable doubt. *See State v. Mendoza*, 2021 UT App 79, ¶ 17, 496 P.3d 275. In *Mendoza*, we explained that "in determining which one of many various acts had been committed in order to satisfy the elements of a particular crime," a jury "might face little difficulty in reaching a verdict." *Id.* By contrast, "a jury forced to deliberate regarding the specific details would face a steeper climb to determine that each juror agreed on which act had actually occurred; and consequently, the State would face a more challenging task of persuading the jury to agree, with specificity, on whether a particular act had been committed." *Id.* Given this reality, and regardless of whether the defense attacks the complainant's credibility in ways that apply to all the claimed incidents, "counsel bears a duty to assist the defendant in reaping

the benefits of a jury trial and to hold the State to its full and complete burden of proof." *Id.*

¶55 These principles are applicable here. On this record, the jury could have unanimously agreed that Jimenez committed sexual abuse once even if the jury had splintered on the specific instance of abuse. And as we discuss more fully under the prejudice prong, the evidence regarding each of the instances of abuse Penny alleged—including, among other things, Penny's memory and motive to fabricate—was different in important ways, and each instance contained evidentiary weaknesses. So, requiring the jury to parse through the allegations here with an instruction would have served to "hold the State to its full and complete burden of proof." *Id.*

¶56 Thus, as we have done in numerous similar cases, *see, e.g.*, *Macleod*, 2024 UT App 32, ¶¶ 25, 73; *Granere*, 2024 UT App 1, ¶ 38; *Garcia-Lorenzo*, 2022 UT App 101, ¶ 37; *Mendoza*, 2021 UT App 79, ¶ 17; *Alires*, 2019 UT App 206, ¶ 25, we conclude that Counsel's performance "fell below an objective standard of reasonableness," *Scott*, 2020 UT 13, ¶ 31 (cleaned up). Under the circumstances presented here, a reasonable attorney would have requested a specific unanimity instruction at some point after it became clear that the State had failed to fulfill its promise to provide clarity. Accordingly, Jimenez has carried his burden of demonstrating that Counsel rendered deficient performance.

2

¶57 Having concluded that Counsel's failure to request a specific unanimity instruction constituted deficient performance, the final question is whether that deficiency prejudiced Jimenez.

¶58 "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107,

¶ 28, 469 P.3d 1150. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). And in assessing whether this standard is met, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶59 "An attorney's failure to seek a specific jury unanimity instruction is not always prejudicial; indeed, we have rejected ineffective assistance claims on prejudice grounds in two types of jury unanimity cases." *Garcia-Lorenzo*, 2022 UT App 101, ¶ 49. The first is when "we have concluded that the State made clear, in closing argument or elsewhere, which act went with each count, and therefore a specific instruction on jury unanimity would not have changed the outcome of the case." *Id.* For the reasons discussed already, this circumstance is not applicable here because the State did not sufficiently clarify the issue during its trial presentation.

¶60 The second type of case where the failure to request an instruction may not be prejudicial is when "we have concluded that, for various case-specific reasons, the outcome of the case would not have changed had the jury been given a specific jury unanimity instruction." *Id.* ¶ 50. For example, in *State v. Mottaghian*, 2022 UT App 8, 504 P.3d 773, the defendant conceded that he had committed a number of sexual acts but contested the consent element. *Id.* ¶ 66. There, we explained that "when the defendant does not dispute that the relevant acts . . . occurred, and there is no meaningful and relevant basis upon which to distinguish the various acts underlying the charges, the absence of a jury unanimity instruction ultimately does not prejudice the defendant because the jury would have had no difficulty in unanimously agreeing that any one of the relevant criminal acts supported the charges." *Id.* We held that prejudice had not been

established because, on the facts of that case, there were "enough uncontested . . . touches to satisfy all of the charged counts, and there [was] no meaningful consent-related basis to distinguish between those touches." *Id.*

¶61 Similarly, in *State v. Case*, 2020 UT App 81, 467 P.3d 893, we concluded that the defendant was not prejudiced by the absence of a specific unanimity instruction because the acts in question were similar and there was no principled basis to distinguish between them from an evidentiary standpoint. *Id.* ¶ 26. The defendant there was charged with seven counts of possession of child pornography but had stipulated that his laptop contained thirty-seven images of child pornography. *Id.* "[T]he jury was left with the task to identify and unanimously agree on seven specific acts of sexual exploitation of a minor from among the thirty-seven images that were identified as child pornography." *Id.* ¶ 22. On those facts, we held that the absence of a specific unanimity instruction was not prejudicial because "there [was] little doubt the jury would have selected the seven most sexually graphic depictions of child pornography among the thirty-seven that were admitted into evidence." *Id.*

¶62 The facts of this case are materially different from those presented in *Mottaghian* and *Case*. Here, Jimenez denied Penny's allegations in full, and in our view the evidence supports meaningful distinctions between the three different instances of abuse Penny described; on this record, it appears entirely possible for jurors to have believed that Jimenez abused Penny under some of the described circumstances but not others.

¶63 Penny described the abuse in Jimenez's bedroom as having happened over "one or two hours," yet there was testimony from Mother that Grandmother was at the house after school "[a]lmost every day" to help take care of the kids and that Penny and Lucy were almost always together. Penny's description of nighttime abuse was fairly vague, and her testimony on this point at least

implied that she wondered whether that alleged abuse had merely been a dream. And Penny's testimony regarding the lice incident was quite brief and unaccompanied by significant corroborating details. Thus, the three specific instances of alleged abuse were materially different from each other—they occurred on different days and in different locations under different circumstances—and each instance came with different potential evidentiary infirmities. We agree with Jimenez that there is a "meaningful and relevant basis upon which to distinguish the various acts underlying the charges," *see Mottaghian*, 2022 UT App 8, ¶ 66, and that jurors could reasonably have come to believe, after hearing the evidence in total, that some but not all of the instances actually took place.

¶64   Under these circumstances, we think there is a reasonable likelihood of a different result had Counsel requested and obtained a specific unanimity instruction. Accordingly, Jimenez has carried his burden of demonstrating that he was prejudiced by Counsel's performance.

CONCLUSION

¶65   Jimenez was charged with a single count of aggravated sexual abuse of a child, but the State put on evidence of three different acts that could have satisfied the charge. Jurors should have been instructed that they needed to unanimously agree as to the specific act supporting the single count; indeed, under well-established case law and on the facts of this case, Counsel's failure to request such an instruction constituted deficient performance that prejudiced Jimenez. On that basis, we reverse Jimenez's conviction and remand the case for further proceedings, including a new trial.

———————